# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BROWN & BROWN, INC.,<br>BROWN & BROWN OF<br>PENNSYLVANIA, INC. and GRINSPEC,<br>INC. | : <br> : <br> : <br> : | |
| | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| ROBERT COLA, RYAN TOLA, and<br>DOYLE ALLIANCE GROUP, | : <br> : | NO. 10-3898 |
| | : | |
| Defendants. | : | |

## MEMORANDUM AND ORDER

RONALD L. BUCKWALTER, S.J.                                    October  4, 2010

Currently pending before the Court are:  (1) Defendant Ryan Tola's Motion to Dismiss

pursuant to Federal Rule of Civil Procedure 12(b)(2); and (2) Defendants Robert Cola, Ryan

Tola, and Doyle Alliance Group's (collectively "all Defendants") Motion to Dismiss the

Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the following reasons,

Defendant Tola's Motion to Dismiss is denied and the Motion by all Defendants to Dismiss is

granted in part and denied in part.

## I.       FACTUAL BACKGROUND

According to the facts set forth in the Complaint, Plaintiff Brown & Brown, Inc. ("Brown

& Brown") is a national insurance brokerage and service company.  (Compl. ¶ 13.)  Brown &

Brown and its subsidiaries, including Brown & Brown of Pennsylvania, Inc. ("Brown-PA")

based in Pennsylvania, and Grinspec, Inc. ("Grinspec") based in New Jersey (collectively "Plaintiffs"), offer a broad range of insurance and reinsurance products and services, as well as risk management, third-party administration, insurance consulting, and other insurance-related services to both the public and private sectors. (Id. ¶¶ 13, 15.) One of the most important ways that Plaintiffs invest in their critical client relationships is through the training and development of their brokers and producers, who are provided with detailed confidential and proprietary information about Plaintiffs' insurance services, business strategies, pricing, and customers. (Id. ¶ 17.) According to the Complaint, were such information to be acquired by a competitor, Plaintiffs would suffer an unfair competitive disadvantage and would face severe damage to their business operations. (Id. ¶ 18.) The obligation of brokers and producers to safeguard Plaintiffs' business interests and confidences is detailed in an Employee Handbook and by individual Employment Agreements, both of which prohibit employees from soliciting or accepting business from clients of Brown & Brown and its subsidiaries, from recruiting or soliciting employees to leave Brown & Brown and its subsidiaries, and from using or disclosing confidential or proprietary information of Brown & Brown and its subsidiaries. (Id. ¶ 19.)

A.     **Brown & Brown Acquires Doyle Consulting Group, Inc.**

As part of its ongoing strategy to acquire smaller, vibrant insurance brokers with potential for growth, Brown & Brown, in 2003, identified a network of related businesses in Pennsylvania and New Jersey as potential partners. (Id. ¶¶ 20-21.) One particular brokerage business – Doyle Consulting Group, Inc. and Doyle Consulting Group of New Jersey, Inc. (collectively "Doyle Consulting") – was owned by Francis Doyle and Kevin Mullin. Following preliminary discussions, Brown & Brown and Doyle Consulting executed an Asset Purchase Agreement

through which Brown & Brown and Brown-PA acquired the assets of Doyle Consulting. (Id. ¶ 22.) Doyle Consulting's shareholders, Doyle and Mullin, were signatories to this Agreement. (Id. ¶ 23.) Plaintiffs purchased the full range of Doyle Consulting's assets, including, among other things, Doyle Consulting's current book of business, tangible personal property, seller contracts, governmental authorizations, records, intangible property such as intellectual property, claims against third parties, and good will. (Id. ¶¶ 24-25.) Plaintiffs' purchase of intellectual property assets from Doyle Consulting included all trademarks and trade names, together with all derivatives of such trademarks and trade names. (Id. ¶ 27.) The Asset Purchase Agreement required Doyle Consulting, Doyle, and Mullin to immediately cease using the corporate name "Doyle Consulting" and any other trademarks or trade names, and all derivatives thereof, in their business dealings. (Id. ¶ 28.) In consideration for these assets, Brown & Brown agreed to pay Doyle Consulting an amount in excess of seventeen million dollars. (Id. ¶ 26.) The Asset Purchase Agreement deal closed on February 1, 2004. (Id. ¶ 22.)

After the closing, Francis Doyle joined Brown-PA as its new executive vice president, and several other former Doyle Consulting employees were hired by Brown-PA. (Id. ¶ 31.) All customers and accounts of Doyle Consulting became customers and accounts of Brown & Brown and its subsidiaries. (Id.) Brown & Brown and Brown-PA continued to use the name "Doyle Consulting" as a service mark in dealings with customers, employees, and the industry in general. (Id. ¶ 32.) Indeed, numerous previous employees of Doyle Consulting, including Defendants Robert Cola and Ryan Tola, used and/or continue to use the internet domain name "@doyleconsultinggroup" or its derivative "@dcgbenefits.com" in e-mails sent in the ordinary course of performing and/or selling insurance services for Plaintiffs. (Id. ¶ 33.) As a result,

customers and others to whom such e-mail communications are directed associate the name "Doyle Consulting" as a service mark affiliated with Brown & Brown and Brown-PA. (Id. ¶ 35.)

### B.     Plaintiffs' Hiring of Robert Cola

Prior to February 2004, Defendant Robert Cola was an employee and key broker for Doyle Consulting. (Id. ¶ 36.) On February 1, 2004, Cola entered into a written employment agreement with Brown-PA ("Cola Employment Agreement"), which contained a non-solicitation of customers provision prohibiting him from directly or indirectly soliciting or inducing any existing or prospective customers of Brown & Brown and Brown-PA, or any of their affiliates, both during his employment with Brown-PA and for twenty-four months after the termination of his employment. (Id. ¶¶ 37-38.) This provision did not prevent Cola from working for a competitor, so long as he did not solicit or accept business from Plaintiffs' customers and he advised any prospective future employers of his contractual non-solicitation obligations. (Id. ¶¶ 40-41.) In addition, Cola expressly agreed not to use or disclose any confidential proprietary information of Brown & Brown or its affiliates both during or after his employment with Brown-PA. Such information included customer lists; insurance carriers; accounts and prospect lists; policy forms and/or rating information; expiration dates; information on risk characteristics; information concerning insurance markets for large or unusual risks; business, selling, and customers strategies and plans; and customer specifications, such as preferences, practices, idiosyncrasies, pricing minimums and maximums, usual needs, time constraints, names, and addresses. (Id. ¶ 42.) Cola further contracted that, both during his employment with Brown-PA and for two years after the cessation of such employment, he would not, directly or indirectly, solicit employees of Brown-PA or Brown & Brown to work for a competitor. (Id. ¶ 44.) Finally,

Cola agreed that, during his employment with Brown-PA, he would "not undertake the active planning or organizing of any business activity competitive with the work Employee performs." (Id. ¶ 46.)  Although the Cola Employment Agreement is with Brown-PA, it expressly identifies Brown & Brown as an intended third-party beneficiary.  (Id. ¶ 60.)

> ### C. **Plaintiffs' Hiring of Ryan Tola**

Prior to February 2004, Defendant Ryan Tola was an employee and key broker for Doyle Consulting.  (Id. ¶ 47.)  On February 1, 2004, Tola entered into a written employment agreement with Brown-PA, giving him the position of producer and senior consultant.  (Id.)  Several years later, on April 2, 2007, Tola was promoted and began employment with another Brown & Brown subsidiary – Plaintiff Grinspec.  (Id. ¶ 48.)  As a result, he signed a new employment agreement ("Tola Employment Agreement"), dated April 2, 2007.  (Id.)  This Agreement contained a number of restrictive covenants similar to Cola's.  (Id. ¶ 49.)  First, it included a non-solicitation of customers provision, prohibiting him from directly or indirectly soliciting or inducing any existing or prospective customers of Brown & Brown and Grinspec, or any of their affiliates, both during his employment with Grinspec and for twenty-four months after the termination of his employment.  (Id. ¶ 50.)  This provision did not prevent Tola from working for a competitor, so long as he did not solicit or accept business from Plaintiffs' customers and he advised any prospective future employers of his contractual non-solicitation obligations.  (Id. ¶¶ 52-53.)  In addition, Tola expressly agreed not to use or disclose any confidential proprietary information of Brown & Brown or its affiliates both during or after his employment with Grinspec.  Such information included customer lists; insurance carriers; accounts and prospect lists; policy forms and/or rating information; expiration dates; information on risk characteristics; information

concerning insurance markets for large or unusual risks; business, selling, and customers strategies and plans; and customer specifications, such as preferences, practices, idiosyncrasies, pricing minimums and maximums, usual needs, time constraints, names, and addresses. (<u>Id.</u> ¶ 54.) Tola further contracted that, both during his employment with Grinspec and for two years after the cessation of such employment, he would not, directly or indirectly, solicit employees of Grinspec or Brown & Brown to work for a competitor. (<u>Id.</u> ¶ 56.) Finally, Tola, agreed that during his employment with Grinspec, he would "not undertake the active planning or organizing of any business activity competitive with the work Employee performs." (<u>Id.</u> ¶ 57.) Although the Tola Employment Agreement is with Grinspec, it expressly identifies Brown & Brown as an intended third-party beneficiary. (<u>Id.</u> ¶ 60.)

### D.    <u>Cola and Tola's Employment with Plaintiffs</u>

All employees of Brown & Brown and its subsidiaries are subject to strict guidelines prohibiting the improper use and disclosure of confidential information. (<u>Id.</u> ¶ 62.)   All employees must agree to and sign a detailed Employee Handbook, which specifically notes that Plaintiffs' employees have access to highly confidential company information and charges Plaintiffs' employees with the responsibility to keep such information confidential. (<u>Id.</u> ¶ 64.) Both Cola and Tola expressly agreed to and signed the Employee Handbook. (<u>Id.</u> ¶ 65.)

Cola began his employment with Brown-PA in February 2004, as a producer. (<u>Id.</u> ¶ 66.) By February 2006, he held the highest executive position at Brown-PA as a "Profit Center Leader" responsible for the overall operation of the office, its employees, and its customers. (<u>Id.</u>) Cola reported directly to Brown & Brown's regional president and served as an officer of Brown-PA. (<u>Id.</u>) Aside from being a key producer, manager, and employee of Brown-PA with respect

to various marketing programs and strategies, he produced, managed, and serviced numerous and significant customers of Plaintiffs. (Id. ¶¶ 67-68.) In return, he was highly compensated and received significant salary, bonuses, and benefits pursuant to his Employment Agreement. (Id. ¶ 69.)

Tola, who began with Brown-PA in February 2004, ultimately commenced his employment as Profit Center Leader of Grinspec on April 1, 2007. (Id. ¶ 70.) Until his resignation in 2010, he held this highest executive position, served as an officer of Grinspec, and was responsible for the overall operation of the office, its employees, and its customers. (Id.) Like Cola, he was not only a key producer, manager, and employee of Brown-PA with respect to various marketing programs and strategies, but he produced, managed, and serviced numerous and significant customers of Plaintiffs. (Id. ¶¶ 71-72.) Again, he was highly compensated through salary, bonuses, and benefits pursuant to his Employment Agreement. (Id. ¶ 73.)

During the course of their job performances, Cola and Tola each acquired and developed trade secrets and confidential and proprietary information with regard to the business of Brown & Brown, Brown-PA, and Grinspec. (Id. ¶ 74.) Both individuals had access to all of their respective employer's documents and information, including materials related to customers, policies, renewal dates, and other confidential and proprietary information. (Id. ¶ 76.) Maintaining the confidentiality of such core confidential and proprietary information was and remains crucial to Plaintiffs, and Plaintiffs have taken reasonable steps to protect and maintain the secrecy of such information. (Id. ¶¶ 80-81.)

E.     **Defendants' Alleged Wrongful Conduct and Efforts to Steal the Assets and Business that Doyle Consulting Sold to Plaintiffs**

As noted above, following the sale of Doyle Consulting to Brown & Brown, Francis Doyle was employed by Brown-PA from February 1, 2004 through January 30, 2006. (Id. ¶ 82.) Doyle, however, purportedly developed a scheme to both take back the very business and goodwill that he had earlier sold to Brown & Brown and reacquire the very employees who, as part of the sale, moved to Brown & Brown. (Id. ¶ 83.) Indeed, in March 2010, Doyle formed a new insurance brokerage firm named Doyle Alliance, and allegedly began operations to compete with Brown & Brown in the insurance agency, brokerage and consulting business. (Id. ¶ 84.) Plaintiffs assert that the use of the name "Doyle Alliance" was in blatant disregard of the Asset Purchase Agreement and was designed to (a) "poach" Brown & Brown's business by using the goodwill purchased by Brown & Brown's acquisition of the trade name; (b) confuse the public; and (c) unlawfully "jump start" Doyle's business. (Id. ¶ 85.)

Doyle recruited and offered employment to both Cola and Tola, and encouraged them to solicit and take Plaintiffs' customers and use Plaintiffs' confidential business information. (Id. ¶ 87.) On June 11, 2010, Cola advised Brown & Brown's Regional President, Thomas E. Riley, that he was resigning, but represented that he was not going to join Doyle. (Id. ¶ 88.) Around the same time period, Tola advised Riley that, despite his friend Cola's actions, he had no intention of resigning from Brown & Brown and/or joining Doyle. (Id. ¶ 89.) Nonetheless, nine days later, on June 15, 2010, Tola resigned his position effective immediately. (Id. ¶ 90.)

Plaintiffs allege, upon information and belief, that immediately after their resignations, Cola and Tola both began to work as insurance brokers and consultants for Doyle Alliance. (Id.

¶ 91.)  Plaintiffs also contend that while Cola and Tola were still employed by Brown & Brown, they were actively engaged in building a competitive business by meeting with Doyle, setting up an office, soliciting Brown & Brown's customers, and using Brown & Brown's proprietary information.  (Id. ¶¶ 92-95.)  Tola and Cola, with Doyle Alliance's knowledge and consent, have since solicited Plaintiffs' customers to cease being customers of Plaintiffs.  (Id. ¶ 96.)  In addition, Plaintiffs claim that Tola and Cola, sometimes with the assistance of Doyle Alliance representatives, have made false, detrimental, and disparaging statements about Plaintiffs and/or their products or services, and have caused Broker of Record letters[1] to be issued under the name of Doyle Alliance.  (Id. ¶¶ 97-98.)

Ultimately, Plaintiffs allege that Cola and Tola breached their Employment Agreements and unlawfully solicited numerous customers to leave Plaintiffs and do business with Doyle Alliance, some of which solicitation occurred while Cola and Tola were still employed by Plaintiffs.  (Id. ¶ 100-101.)  Indeed, numerous customers of Plaintiffs have either moved their business from Plaintiffs to Doyle Alliance, provided notice that they are moving their business from Plaintiffs to Cola, Tola, and/or Doyle Alliance, or have caused Broker of Record letters to be issued in favor of Doyle Alliance.  (Id. ¶ 102.)  Plaintiffs estimate the losses caused by these alleged violations of the Employment Agreements to be in excess of two million dollars.  (Id. ¶ 103.)

---

[1]  Broker of Record letters are used in the insurance industry to recognize the authority of the insurance broker to act for and pursue insurance markets and products for the brokerage company's customers, and are essential to identifying the brokerage company entitled to receive commissions from insurance carriers for any business underwritten by such carriers in favor of the brokerage company's customers.  (Id. ¶ 99.)

**F.** **The Present Lawsuit**

On August 4, 2010, Plaintiffs commenced the present lawsuit against Cola, Tola, and Doyle Alliance Group, setting forth fifteen Counts as follows. Count I claims unfair competition under the Lanham Act, 15 U.S.C. § 1125, due to Defendants' use of the name "Doyle Alliance Group" and the internet domain "doylealliancegroup.com." (Id. ¶¶ 109-118.) Count II asserts trademark infringement under the Lanham Act resulting from Defendants' use of the internet domain name "doylealliance group.com." (Id. ¶¶ 119-124.) Count III sets forth a state law claim of unfair competition, again caused by Defendants' use of the name "Doyle Alliance Group." (Id. ¶¶ 125-133.) Count IV claims breach of contract against solely Cola and Tola, due to their alleged violation of their respective Employment Agreements. (Id. ¶¶ 134-140.) Count V avers a breach of fiduciary duty and/or duty of loyalty against Defendants Cola and Tola. (Id. ¶¶ 141-146.) Count VI asserts tortious interference with existing contractual relations against Doyle Alliance only for interfering with Cola and Tola's Employment Agreements. (Id. ¶¶ 148-156.) Count VII sets forth another tortious interference claim against all Defendants for interference with Plaintiffs' contractual and business relationships with customers. (Id. ¶¶ 157-163.) Count VIII contends that all Defendants tortiously interfered with Brown & Brown's contractual relations with its employees. (Id. ¶¶ 164-171.) Counts IX, X, and XI allege, against all Defendants, misappropriation of business, misappropriation of confidential and proprietary information, and misappropriation of property, respectively. (Id. ¶¶ 172-190.) Finally, Counts XII, XIII, XIV, and XV respectively assert unfair competition, civil conspiracy, conversion, and unjust enrichment against all Defendants. (Id. ¶¶ 188-211.)

On September 7, 2010, Defendant Ryan Tola filed a Motion to Dismiss the Complaint in

its entirety under Federal Rule of Civil Procedure 12(b)(2).  On the same date, all Defendants

joined in a Motion to Dismiss Plaintiffs' Complaint under Rule 12(b)(6) for failure to state a

claim upon which relief may be granted.  The Court now turns to a discussion of these Motions.

## II.	APPLICABLE STANDARDS OF REVIEW

### A.	Rule 12(b)(2)

Motions to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure

12(b)(2) require the court to accept as true the allegations of the pleadings and all reasonable

inferences therefrom, and to resolve all factual disputes in favor of the plaintiff.  FED. R. CIV. P.

12(b)(2); see also Pinker v. Roche Holdings Ltd., 292 F.3d 361, 368 (3d Cir. 2002).  The rule,

however, "does not limit the scope of the court's review to the face of the pleadings"; rather the

court must consider any affidavits submitted by the parties.  Scott v. Lackey, No. CIV.A.02-

1586, 2005 WL 2035598, at *1-2 (M.D. Pa. Aug. 11, 2005).

Although a defendant has the initial burden of raising the defense of lack of personal

jurisdiction, once such a defense is raised, the burden shifts to the plaintiff to demonstrate facts

that suffice to support an exercise of personal jurisdiction.  Provident Nat. Bank v. Cal. Fed. Sav.

& Loan Ass'n., 819 F.2d 434, 437 (3d Cir. 1987); Cumberland Truck Equip. Co. v. Detroit

Diesel Corp., 401 F. Supp. 2d 415, 418 (E.D. Pa. 2005).  Plaintiff may do so through affidavits or

competent evidence that show sufficient contacts with the forum state to establish personal

jurisdiction.  De Lage Landen Fin. Servs., Inc. v. Rasa Floors, LP, No. CIV.A.08-0533, 2008 WL

4822033, at *3 (E.D. Pa. Nov. 4, 2008).  Such contacts must be established with "reasonable

particularity," but need only amount to a prima facie case in favor of personal jurisdiction.

Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992) (quoting

Provident, 819 F.2d at 437). If the plaintiff meets this burden, the defendant must then establish the presence of other considerations that would render jurisdiction unreasonable. DeLage, 2008 WL 4822033, at *3 (citing Carteret Sav. Bank v. Shushan, 954 F.2d 141, 150 (3d Cir. 1992)).

**B.** **Rule 12(b)(6)**

Under Rule 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005). In Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), the United States Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555. It emphasized that it would not require a "heightened fact pleading of specifics," but only "enough facts to state a claim to relief that is plausible on its face." Id. at 570.

Following the basic precepts of Twombly, the Supreme Court, in the subsequent case of Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), enunciated two fundamental principles applicable to a court's review of a motion to dismiss for failure to state a claim. First, it noted that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 1949. Thus, although "[Federal] Rule [of Civil Procedure] 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 1950. Second, the Supreme Court emphasized that "only a complaint that states a plausible claim for relief survives a motion to dismiss." Id.

12

"Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. The Supreme Court explained:

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

Id. at 1949 (citing Twombly, 550 U.S. at 556-57).

Expanding on the Twombly/Iqbal standards, the United States Court of Appeals for the Third Circuit succinctly summarized the two-prong analysis to be undertaken by district courts during a Rule 12(b)(6) review:

> [A]fter *Iqbal,* when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The district court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a district court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to show such an entitlement with its facts. As the Supreme Court instructed in *Iqbal,* where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief. This plausibility requirement will be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (internal citations omitted).

Notwithstanding the foregoing, nothing in Twombly, Iqbal, or Fowler has altered some of the fundamental underpinnings of the Rule 12(b)(6) standard of review. Arner v. PGT Trucking, Inc., No. CIV.A.09-565, 2010 WL 1052953, at *2 (W.D. Pa. Mar. 22, 2010); Spence v.

Brownsville Area Sch. Dist., No. CIV.A.08-626, 2008 WL 2779079, at *2 (W.D. Pa. Jul. 15, 2008). Federal Rule of Civil Procedure 8 still requires only a short and plain statement of the claim showing that the pleader is entitled to relief and need not contain detailed factual allegations. FED. R. CIV. P. 8; Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008). Further, the court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006). Finally, the court must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Pinkerton v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002).

## III.    DEFENDANT TOLA'S MOTION TO DISMISS UNDER RULE 12(b)(2)

Under Federal Rule of Civil Procedure 4(k)(1)(A), a federal court may exercise personal jurisdiction over a non-resident defendant to the extent provided by the law of the state in which the federal court sits. FED. R. CIV. P. 4(k)(1)(A); see also Martin v. Citizens Fin. Group, Inc., No. CIV.A.10-260, 2010 WL 3239187, at *3 (E.D. Pa. Aug. 13, 2010). In this case, the forum state is Pennsylvania, thus necessitating the application of Pennsylvania's long-arm statute. Under this statute, personal jurisdiction of Pennsylvania courts over nonresident defendants is permitted "to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States." 42 PA. CONS. STAT. § 5322(b); see Mellon Bank, 960 F.2d at 1221 ("The Pennsylvania statute permits the courts of that state to exercise personal jurisdiction over nonresident defendants to the constitutional limits of the due process clause of the fourteenth amendment."). Therefore, a court's inquiry is solely whether the exercise of personal jurisdiction over the

defendant would be constitutional under the Due Process Clause.  Mellon Bank, 960 F.2d at

1221.  Pursuant to these constitutional considerations, physical presence within the forum is not

required to establish personal jurisdiction over a nonresident defendant.  IMO Indus., Inc. v.

Kiekert AG, 155 F.3d 254, 259 (3d Cir.1998).  Instead, personal jurisdiction may be based on

either a defendant's general contacts or his specific contacts with the forum.  Gen. Elec. Co. v.

Deutz AG, 270 F.3d 144, 150 (3d Cir. 2001).

In the present case, Plaintiffs allege that the Court has both general and specific

jurisdiction over Defendant Tola.  The Court addresses each argument individually.

## A.      General Jurisdiction

"General jurisdiction depends on a defendant having maintained 'continuous and

systematic contacts' with the forum state."  D'Jamoos es rel. Weingeroff v. Pilatus Aircraft Ltd.,

566 F.3d 94, 107 (3d Cir. 2009) (citing Helicopteros Nacionales de Colombia, S.A. v. Hall, 466

U.S. 408, 414-16 (1984)).  Proof of such contact requires a showing of "extensive and pervasive"

activity in the forum state.  See Reliance Steel Prods. Co. v. Watson, Ess, Marshall, & Engass,

675 F.2d 587, 589 (3d Cir. 1982) (quotations omitted).  The defendant's contacts need not be

related to the cause of action being litigated.  McMullen v. European Adoption Consultants, Inc.,

109 F. Supp. 2d 417, 418 (W.D. Pa. 2000).  If the foreign defendant "maintains 'continuous and

systematic' contacts with a state, the state has general personal jurisdiction over the party, and the

non-resident may be sued in that state on any claim."  Wilmington Fin., Inc. v. Moonis, No.

CIV.A.08-2365, 2008 WL 4661033, at *3 (E.D. Pa. Oct. 21, 2008) (quotations omitted).

When claiming general personal jurisdiction over Tola, Plaintiffs argue, without further

elaboration, that "[t]he 'bread and butter' of Tola's business is selling insurance products. He and the other Defendants have sold such products to individuals within Pennsylvania, which, because their business is regional, is a market from which defendants derive a significant portion of their total revenue." (Pls.' Resp. Tola Mot. Dismiss 18.) This bald statement, however, fails to establish the extensive and pervasive activity necessary for a finding of general jurisdiction. According to the affidavit submitted by Defendant, Tola is a citizen and resident of New Jersey. (Def. Tola's Mot. Dismiss, Ex. A, Aff. of Ryan Tola ¶¶ 1-2 (Sep. 2, 2010) ("Tola Aff.").) He has never lived in Pennsylvania, owns no property in Pennsylvania, worked for Grinspec, Inc., which is a New Jersey corporation with offices located solely in New Jersey, and is not aware of any Grinspec customers or business done by Grinspec in Pennsylvania. (Tola Aff. ¶¶ 4-11.) Plaintiffs' mere speculation that Tola may have sold products to individuals within Pennsylvania does not satisfy general jurisdiction's high threshold. See 4 CHARLES ALAN WRIGHT AND ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1067.5 (3d ed. 2008) ("As many of the illustrative federal cases . . . indicate, the defendant must be engaged in longstanding business in the forum state, such as marketing or shipping products, or performing services or maintaining one or more offices there; activities that are less extensive than that will not qualify for general in personam jurisdiction."). Indeed, nothing in any pleading or exhibit before the Court shows any contacts by Tola with Pennsylvania that could be classified as "continuous and systematic."[2]

---

[2] Plaintiffs cite to the case of TJS Brokerage & Co., Inc. v. Mahoney, 940 F. Supp. 784 (E.D. Pa. 1996) for the proposition that general jurisdiction is proper where a company regularly solicits business in the forum state and advertises in a way that at least partially targets the forum market. Id. at 789. In that case, however, the defendant company had a sales force in Pennsylvania to solicit Pennsylvania business, and also used Pennsylvania-based trucking companies to transport goods through Pennsylvania. Id. at 790. On those grounds, the court found that the defendant "maintained a 'continuous and systematic part of its general business in Pennsylvania' since it

Consequently, the Court declines to exercise general personal jurisdiction over Tola.

**B.     Specific Jurisdiction**

In the absence of "continuous and systematic" contacts, a plaintiff may rely on "specific jurisdiction" where the cause of action is related to or arises out of the defendant's contacts with the forum. IMO Indus., 155 F.3d at 259 (citing Helicopteros, 466 U.S. at 414 n.8). To properly exercise specific jurisdiction under the Due Process Clause, a plaintiff must satisfy a three-part test. Louis A. Grant, Inc. v. Hurricane Equip., Inc., No. CIV.A.07-438, 2008 WL 892152, at *3 (W.D. Pa. Apr. 2, 2008). First, the plaintiff must show that the defendant has "constitutionally sufficient 'minimum contacts' with the forum." IMO Indus, 155 F.3d at 259 (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985)). Second, the plaintiff's claim must "arise out of or relate to those activities." Helicopteros, 466 U.S. at 414. Third, the reviewing court may consider additional factors to ensure that the exercise of jurisdiction otherwise "comport[s] with 'fair play and substantial justice.'" Burger King, 471 U.S. at 476 (quoting Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. and Placement, 326 U.S. 310, 320 (1945)); see also O'Connor v. Sandy Lane Hotel Co., Ltd., 496 F.3d 312, 317 (3d Cir. 2007) (enumerating the three elements of specific jurisdiction).

---

solicits business regularly from Pennsylvania and advertises in a way that is at least partially targeted to the forum market." Id. The present case is quite distinguishable in that Plaintiffs cannot establish that Tola – an individual, not a company – had such similarly extensive contacts with Pennsylvania, or that he himself derived even a portion of his income from Pennsylvania customers. See also Henning v. Suarez, No. CIV.A.09-4282, __ F. Supp. 2d ___, 2010 WL 1817257, at *6-7 (E.D. Pa. May 4, 2010) (declining to find personal jurisdiction over a *company* where defendant's sales and associated advertising expenditures, contacts with distributors, advertising activities, and website were not "sufficiently continuous and systematic to give rise to general jurisdiction over [d]efendant.").

To satisfy the first component of the specific jurisdiction test, the acts identified by plaintiff must be "such that [the defendant] should reasonably anticipate being haled into court [in the forum state]." World-Wide Volkswagon Corp. v. Woodson, 444 U.S. 266, 297 (1980). It has long been recognized that minimum contacts necessary to support specific jurisdiction exist only where the defendant "has purposefully directed its activities toward the residents of the forum state . . . or otherwise 'purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" IMO Indus., 155 F.3d at 259 (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958) (other internal quotations omitted)). "This test is intended to protect a non-resident defendant from jurisdiction based on contacts that are 'random, fortuitous,' or 'attenuated,' or that result from the unilateral activity of another party or a third person." Pullman Fin. Corp. v. Hotaling, No. CIV.A.07-1703, 2008 WL 2563372, at *4 (W.D. Pa. June 24, 2008) (quoting Burger King, 471 U.S. at 475).

With respect to the second component, "[t]he animating principle behind the relatedness requirement is the notion of a tacit quid pro quo that makes litigation in the forum reasonably foreseeable." O'Connor, 496 F.3d at 322. "Out-of-state residents who 'exercise[ ] the privilege of conducting activities within a state . . . enjoy[ ] the benefits and protection of' the state's laws; in exchange, they must submit to jurisdiction over claims that arise from or relate to those activities." Id. (citing Int'l Shoe, 326 U.S. at 319; Burger King, 471 U.S. at 475-76). As noted by the Third Circuit, "in the course of this necessarily fact-sensitive inquiry, the analysis should hew closely to the reciprocity principle upon which specific jurisdiction rests. . . . With each purposeful contact by an out-of-state resident, the forum state's laws will extend certain benefits and impose certain obligations." O'Connor, 496 F.3d at 323 (internal citations omitted).

In the case of an intentional tort claim, the first and second factors are replaced by the "effects" test articulated by the United States Supreme Court in Calder v. Jones, 465 U.S. 783 (1984). See IMO Indus., 155 F.3d at 265 (adopting Calder "effects" test). "Under the effects test, a court may exercise personal jurisdiction over a nonresident defendant who acts outside the forum state to cause an effect upon the plaintiff within the forum state." Carteret Sav. Bank, FA v. Shushan, 954 F.2d 141, 148 (3d Cir. 1992). To establish personal jurisdiction under the Calder "effects" test, a plaintiff must show that: (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the resulting harm; and (3) the defendant expressly aimed its tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity. See IMO Indus., 155 F.3d at 265-66. If all three factors are met, a court will find personal jurisdiction. Id. The Third Circuit has recognized, however, that Calder did not "carve out a special intentional torts exception to the traditional specific jurisdiction analysis, so that a plaintiff could always sue in his or her home state." Id. at 265. Rather, Calder simply acknowledged that "the unique relations among the defendant, the forum, the intentional tort, and the plaintiff may under certain circumstances render the defendant's contacts with the forum – which otherwise would not satisfy the requirements of due process – sufficient." Id.

Finally, even where the sufficient minimum contacts are present, the third prong of the specific jurisdiction test requires that a reviewing court ensure that the exercise of jurisdiction otherwise "comport[s] with 'fair play and substantial justice.'" Burger King, 471 U.S. at 476 (quoting Int'l Shoe, 326 U.S. at 320). The United States Supreme Court has identified five factors that courts should consider when balancing jurisdictional reasonableness, including: (1)

the burden on the defendant; (2) the forum State's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate and international judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the procedural and substantive interests of other nations. O'Connor, 496 F.3d at 324 (citing Burger King, 471 U.S. at 477; Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 113 (1987)).

Defendant Tola argues that he does not have sufficient contacts with Pennsylvania related to Plaintiffs' claims to satisfy this standard. As with his opposition to general jurisdiction, he relies on his affidavit, which states that he is a resident of New Jersey; his employment with Grinspec, which forms the basis of the claims against him, was exclusively in New Jersey; Grinspec is a New Jersey corporation with no office in Pennsylvania and no customers in Pennsylvania; Tola did no work in Pennsylvania while employed by Grinspec; Tola's Employment Agreement with Grinspec, dated April 2, 2007, was sent to and signed by Tola at the New Providence, New Jersey office of Grinspec; and the Employment Agreement provides for the application of New Jersey law. (Tola Aff. ¶¶ 1, 6-14, 19.) Finally, Tola alleges that he is currently in charge of Doyle Alliance's Woodbridge, New Jersey office, is neither a shareholder, director, nor officer of Doyle Alliance, and (c) has not solicited any business on behalf of Doyle Alliance in Pennsylvania. (Id. ¶¶ 15-19.)

Plaintiffs' responsive argument focuses not on Tola's work while loyally employed with Grinspec, but rather the period starting in late 2009/early 2010, when Doyle, Tola, and Cola were purportedly planning the startup of Doyle Alliance, a Pennsylvania corporation. Specifically, they argue that Tola began to plan and implement his defection from Plaintiffs to Doyle Alliance and, in doing so, purposefully availed himself of the privilege of doing business in Pennsylvania.

The Court is satisfied that such contacts satisfy Plaintiffs' burden to establish a prima facie case for the exercise of personal jurisdiction. <u>Mellon Bank</u>, 960 F.2d at 1223. The Complaint expressly alleges that:

> 91. Upon information and belief, immediately after their resignations, Cola and Tola began to work as insurance brokers and consultants for the newly-formed Doyle Alliance.

> 92. Upon information and belief, months prior to their resignations, and while they were being paid by and had fiduciary duties to plaintiffs, Cola and Tola were actively engaged in building a competitive business – deciding on office space, technology and other components for the new business. Defendants also had meetings, communications and/or conversations with Doyle and the others affiliated with Doyle Alliance during which they discussed their intention to combine efforts and pirate away plaintiffs' customers and employees to Doyle Alliance.

> 93. Upon information and belief, Cola and Tola each, in violation of their contractual restrictions and their fiduciary duties and duties of loyalty to Brown-Pa. and Grinspec, respectively planned and organized a business activity to compete with plaintiffs while they were still employed by plaintiffs.

> 94. Further, upon information and belief, upon becoming employees of Doyle Alliance, Tola and Cola, with the encouragement of Doyle Alliance, developed plans to solicit and divert customers and employees to Doyle Alliance.
> . . .
> 100. Upon information and belief, Cola and Tola may have been diverting or "parking" customers or reserving and/or withholding services for customers and accounts so that such customers and accounts could be transferred or diverted by Cola and Tola to Doyle Alliance, as their new employer, which would then more easily enable Doyle Alliance to "jump start" their new business with an existing customer base – plaintiffs' customer base.

(Compl. ¶¶ 91-94, 100.) As Doyle Alliance is undisputedly a Pennsylvania corporation with its

principal place of business in Philadelphia, Pennsylvania, the Court can extrapolate from the

Complaint's allegations that Tola was actively involved in laying the groundwork to start and

promote a Pennsylvania business.  Moreover, taking Plaintiffs' allegations as true, the Court

finds a reasonable inference that Tola reached into Pennsylvania to transfer files and documents

to Doyle Alliance and has reached out to Pennsylvania customers to solicit business.[3]  Finally,

the Employment Agreement, which was allegedly violated by such actions, expressly included

Brown & Brown – a Pennsylvania corporation – as one of its intended third-party beneficiaries.

In addition, Plaintiffs have put forth sufficient allegations to establish that Plaintiffs'

claims against Tola relate to and arise out of his contacts with Pennsylvania.  The heart of

Plaintiffs' Complaint contends that Tola's actions in aiding the establishment of Doyle Alliance

and ultimately becoming a Doyle Alliance employee was the direct cause of the alleged Lanham

Act violations and breaches of contract.  Tola's alleged purposeful contact with Pennsylvania by

helping to create a Pennsylvania corporation therefore brings with it the obligation of submitting

to Pennsylvania's jurisdiction over those activities.  See O'Connor, 496 F.3d at 323.

With respect to the intentional torts alleged in the Complaint, Plaintiffs have adequately

satisfied the Calder effects test.  Plaintiffs have clearly alleged that Defendant Tola committed

several intentional torts and that Plaintiffs felt the brunt of the harm in Pennsylvania, such that

Pennsylvania can be said to be the focal point of the resulting harm.  Moreover, the reasonable

---

[3]  Plaintiffs also assert that Tola's business is currently promoted via a website operated by Doyle
Alliance Group, "which is accessible to and meant to be accessed by individuals within
Pennsylvania."  (Pls.' Resp. Tola Mot. Dismiss 14.)  Notably, "[c]ourts have recently placed
particular emphasis on the need for a website to specifically target a forum in order for it to serve
as a basis for general jurisdiction."  Henning, 2010 WL 1817257, at *10.

inference from the Complaint's allegations is that (1) Defendant Tola knew that Plaintiffs, two of

which are Pennsylvania corporations, would suffer harm from his tortious conduct and (2) Tola

aimed his conduct at Pennsylvania by seeking to transfer Plaintiffs' proprietary information to

another Pennsylvania corporation.

Finally, the Court finds that the exercise of personal jurisdiction would comport with

notions of fair play and substantial justice.  Defendant Tola bears little burden by litigating in

Pennsylvania given the close proximity between the two forums, the fact that the principal place

of Doyle Alliance, Tola's employer, is in Pennsylvania, and Tola's attorney hails from

Pennsylvania.  Although Tola's individual employment agreement is governed by New Jersey

law, Grinspec's parent company is a Pennsylvania business, giving Pennsylvania an interest in

ensuring its well-being and adjudicating wrongs against it.  Finally, the claims against all of the

Defendants share multiple common elements, thereby making their joint resolution convenient

and effective for both Plaintiffs and the Court.[4]  To reach a contrary result would simply create

the potential of concurrent and duplicative proceedings.

In short, at this stage of this litigation, Plaintiff has set forth ample allegations to establish

that Defendant Tola has sufficient minimum contacts with Pennsylvania and that the Court's

exercise of personal jurisdiction over Tola would comport with notions of fair play and

---

[4]  Defendant Tola argues that Plaintiff Grinspec has already adjudicated another case against a
former employee in a New Jersey court, which found that the non-compete provisions of
Grinspec's employment contracts are not enforceable with respect to the public clients of
Grinspec.  See Grinspec, Inc. v. Lance, No. CIV.A.3313-01T1, 2002 WL 32442790 (N.J. Super.
Ct. App. Div. Aug. 13, 2002).  The decision in that case, however, was based on "the totality of
the circumstances," which are significantly different from those at issue in this case.  Id. at *9.
The facts relevant to the claims against Tola are identical to the facts against Defendant Cola,
making it illogical to litigate them simultaneously in separate forums.

substantial justice. While discovery could subsequently reveal otherwise,[5] the allegations of the Complaint together with the evidence before the Court satisfy Plaintiff's burden of setting forth a prima facie case. Because nothing in the parties' filings suggests that the exercise of personal jurisdiction over Tola is unconstitutional, the Court denies Defendant Tola's Motion to Dismiss.

## IV.     MOTION BY ALL DEFENDANTS TO DISMISS UNDER FED. R. CIV. P. 12(b)(6)

Aside from Defendant Tola's Motion to Dismiss for Lack of Personal Jurisdiction, all Defendants have joined in a Federal Rule of Civil Procedure 12(b)(6) Motion seeking dismissal of Plaintiffs' Complaint on several grounds. First, Defendants assert that Counts I and II, alleging unfair competition and trademark infringement under the Lanham Act, cannot survive Rule 12(b)(6) scrutiny. Upon dismissal of these claims, which are the sole federal causes of action, the Court should decline to exercise supplemental jurisdiction over the remaining state law claims. Second, Defendants contend that, in the event the Court retains jurisdiction, Plaintiffs' state law tort claims are barred by the "gist of the action" doctrine. Third, Defendants assert that the breach of fiduciary duty/duty of loyalty claims against Cola and Tola must be

---

[5] Even if this Court were to find that Plaintiffs failed to sustain their burden, dismissal would not be the appropriate remedy. As noted by the Third Circuit,

> Although the plaintiff bears the burden of demonstrating facts that support personal jurisdiction, . . . courts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is "clearly frivolous." . . . If a plaintiff presents factual allegations that suggest "with reasonable particularity" the possible existence of the requisite "contacts between [the party] and the forum state," . . . the plaintiff's right to conduct jurisdictional discovery should be sustained.

Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 456 (3d Cir. 2003). Plaintiffs' claims against Tola are not clearly frivolous

dismissed since neither Defendant owed such duties to Plaintiffs.  Fourth, they argue that because

Pennsylvania law does not permit claims for unjust enrichment where the parties' relationship is

founded on express contract, Plaintiffs' claim for unjust enrichment must be dismissed.  Fifth,

Defendants assert that Counts VI and VII for tortious interference with contractual relations

against Doyle Alliance, and Counts III and XII for unfair competition, are duplicative causes of

action.  Finally, Defendants seek dismissal of Plaintiffs' state unfair competition claim on the

same grounds as it seeks dismissal of the Lanham Act claim.  The Court addresses each

allegation separately.

### A.     Whether the Complaint Must Be Dismissed for Lack of Subject Matter Jurisdiction

As noted above, Defendants' primary allegation argues that because the sole federal

claims under the Lanham Act fail as a matter of law, the Court lacks subject matter jurisdiction.

In turn, Defendants assert that Court should decline to exercise supplemental jurisdiction over the

remaining state law claims.  To resolve this issue, two separate inquiries are crucial.  First, the

Court must examine the viability of Plaintiffs' Lanham Act claim.  Thereafter, the Court must

decide whether to exercise supplemental jurisdiction over the state law claims.

### 1.     Whether the Lanham Act Claim Fails as a Matter of Law

Counts I and II of Plaintiffs' Complaint allege violations of the Lanham Act in the form

of unfair competition under section 43(a), 15 U.S.C. § 1125,[6] and trademark infringement under

---

[6] Section 43(a) of the Lanham Act, which governs federal unfair competition claims, provides in
part:

    Any person who, on or in connection with any goods or services, or any container for

25

section 32, 15 U.S.C. § 1114.[7]  The tests for copyright infringement and unfair competition under

---

goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which–

> **(A)** is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . .

. . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C.A. § 1125.

[7] Section 32 of the Lanham Act provides:

Any person who shall, without the consent of the registrant--

> **(a)** use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

> **(b)** reproduce, counterfeit, copy, or colorably imitate a registered mark and
>
> apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

the Lanham Act are essentially the same. A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir. 2000). Thus, to prevail on either claim, a plaintiff must demonstrate that: (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark causes a likelihood of confusion. Id. Moreover, to establish a trademark infringement claim, the plaintiff bears the additional burden of showing that the defendant's use of the offensive mark is unauthorized. Piquante Brands Int'l, Ltd. v. Chloe Foods Corp., No. CIV.A.08-4248, 2009 WL 1687484, at *3 (D.N.J. June 16, 2009).

Defendants' current motion attacks all three of the elements common to the unfair competition and trademark infringement claims. Moreover, they contend that Defendants Tola and Cola cannot be individually liable for any of the alleged violations.

### a. Existence of a Valid and Legally Protectable Mark

As noted above, "the first element of a Lanham Act claim requires that the contested mark be valid and legally protectable." AFL Philadelphia LLC v. Krause, 639 F. Supp. 2d 512, 525 (E.D. Pa. 2009). "Personal names can serve as a trademark, but they are considered 'descriptive,' not inherently distinctive marks, so they are treated as protectable marks only upon showing of distinctiveness and secondary meaning." Tillery v. Leonard & Sciolla, LLP, 437 F. Supp. 2d 312, 320-21 (E.D. Pa. 2006). An identifying mark is distinctive either if: (1) it is inherently distinctive, or (2) it has acquired distinctiveness through secondary meaning. Two Pesos, Inc. v Taco Cabana, Inc., 505 U.S. 763, 769 (1992). "A personal name acquires secondary

---

15 U.S.C.A. § 1114(1).

meaning when the name and the business it is associated with 'become synonymous in the public mind and the secondary meaning submerges the primary meaning of the name as a word identifying a person, in favor of its meaning as a word identifying that business.'" AFL Philadelphia, 639 F. Supp. 2d at 526 (quoting Tillery, 437 F. Supp. 2d at 321 (internal quotations omitted)). Accordingly, the claimant must not only show that it used the personal name as a trademark, "but that a substantial portion of the consuming public associates [the name] specifically with [its] business." Tillery, 437 F. Supp. 2d at 321 (quoting Flynn v. AK Peters, Ltd., 377 F.3d 13, 20 (1st Cir. 2004)). "If the mark is primarily a personal name, then the senior user must prove the existence of secondary meaning in its mark at the time and place that the junior user first began use of that mark." Tillery, 437 F. Supp. 2d at 321.

To date, courts have not established the specific elements necessary to determine whether a mark has acquired the requisite secondary meaning. AFL Philadelphia, 639 F. Supp. 2d at 526. The Third Circuit, however, has set forth a non-exclusive list of factors to guide such an inquiry, as follows: (1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and (11) actual confusion. Commerce Nat. Ins. Servs., Inc. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 438 (3d Cir. 2000). Notably, "the words 'secondary meaning' need not appear in the complaint; the complaint need only contain allegations that, in the light most favorable to [plaintiff], demonstrate the existence of a secondary meaning." Lewis v. Marriott Int'l, Inc., 527 F. Supp. 2d 422, 427 (E.D. Pa. 2007).

In the case at bar, Defendants argue that the name "Doyle" was not a distinctive mark that

Plaintiffs purchased in 2004 when they acquired the assets of Doyle Consulting. They assert that Plaintiffs' Complaint fails to allege that the name "Doyle" was synonymous with the insurance industry in the mid-Atlantic region as of May/June 2010, which was the time that Doyle Alliance allegedly began to improperly use it. They go on to argue that notably absent from the factual recitation in the Complaint are any allegations that "the name Doyle was or still is synonymous within the insurance industry and the relevant market." (All Defs.' Mot. Dismiss 10.) Finally, Defendants assert that the Complaint contains no statements alleging that, in May/June 2010, Plaintiffs still used the name "Doyle Consulting" or the domain names "@doyle consulting group.com" or "@dcgbenefits.com," thereby failing to establish continual use of the name, as is required for an unregistered mark.

Defendants' argument, however, mistakenly attempts to hold Plaintiffs to a summary judgment standard of proof, despite the fact that this case is at its earliest stages. Viewing the allegations under the Rule 12(b)(6) standard of review, the Court finds that Plaintiffs have sufficiently alleged the existence of a valid and legally protectable mark. The Complaint noted that numerous employees of Brown & Brown and Brown-PA, who were previously employees of Doyle Consulting Group prior to the 2004 acquisition, continued to use the internet domain name "@doyleconsultinggroup.com" or its derivative "@dcgbenefits.com" in their e-mail addresses in the ordinary course of performing and/or selling insurance services. (Compl. ¶ 33.) Moreover, it asserts that "[b]ecause of its advertising and marketing, Brown & Brown and Brown-PA have developed a substantial level of success in the marketing and commercialization of its insurance services sold under the Mark, 'Doyle Consulting,' and have created a strong following of loyal customers for such services." (Id. ¶ 34.) The Complaint later alleges that "[w]hen Brown &

Brown and Brown-Pa. purchased the Intellectual Property Assets, including the name 'Doyle' as that name is recognized in the insurance industry in the mid-Atlantic region, Brown & Brown and Brown-Pa. also purchased, among other things, the goodwill associated with that name." (Id. ¶ 110.) "Defendants fully appreciated that Brown & Brown and Brown-Pa. valued the name 'Doyle Consulting Group' as that name is recognized in the insurance industry in the mid-Atlantic region and expressly agreed, in Section 7.11, to 'cease all operational use' of the corporate name 'or any derivatives thereof' when the Asset Purchase Agreement was signed." (Id. ¶ 111.) Taking all of these allegations as true, the Court concludes that, for purposes of the present Motion, the name "Doyle" and the domain names "doyleconsultinggroup.com" and "dcgbenefits.com" acquired sufficient distinctiveness within the mid-Atlantic insurance industry at the time that Brown & Brown entered into the Asset Purchase Agreement, and that the name "Doyle" created an association with successful insurance brokerage business.

Finally, Plaintiffs have adequately pled continued use of the name through to the present. The Complaint states, "[f]ollowing the closing, Brown & Brown and Brown-Pa. continued to use the name 'Doyle Consulting' as a service mark in its business operations in its dealings with customers, employees and the industry in a variety of contexts." (Id. ¶ 32.) Moreover, "[b]ecause of its continuous use of the internet domain name '@doyleconsultinggroup' or its derivative '@dcgbenefits.com' in the e-mail addresses of former Doyle Consulting Group employees (who are now Brown & Brown and Brown-Pa. employees), customers and others to whom such e-mail communications are directed associate the name 'Doyle Consulting' and its derivatives as a service mark affiliated with Brown & Brown and Brown-Pa." (Id. ¶ 35.)

In sum, taking all factual allegations in the Complaint as true, Plaintiffs have pled a

plausible claim for relief under the Lanham Act.  While Defendants demand that Plaintiffs'

Complaint contain further details and more specifics, they disregard Federal Rule of Civil

Procedure 8's requirement of a short and plain statement of relief.  FED. R. CIV. P. 8; Phillips,

515 F.3d at 233.  Under a reasonable reading of the Complaint, the Court finds that Plaintiffs

have satisfied the first element of establishing a valid and legally distinguishable mark over

which they have maintained continuous use.

### b.  Plaintiffs' Ownership of the Mark

As part of their prima facie case, Plaintiffs also bear the burden of proving that they own

the mark in the relevant market area.  Laurel Capital Group, Inc. v. BT Fin. Corp., 45 F. Supp. 2d

469, 485 (W.D. Pa. 1999).  Because a trademark is only a symbol, "it may be transferred or

assigned only to represent the transfer of goodwill connected with a particular business . . . and

cannot be transferred separately from the goodwill of the business."  Premier Dental Prods Co. v.

Darby Dental Supply Co., 794 F.2d 850, 853 (3d Cir. 1986).  "Moreover, although transfer of

physical or tangible assets is not required, an assignment without the transfer of physical assets

will only be upheld where the assignee 'is producing a product or providing a service which is

substantially similar to that of the assignor and where consumers will not be deceived or

harmed.'"  InterState Net Bank v. NetB@nk, Inc., 348 F. Supp. 2d 340, 349 (D.N.J. 2004)

(quoting Pilates, Inc. v. Current Concepts, Inc., 120 F. Supp. 2d 286, 311 (S.D.N.Y. 2000)).

"The mere fact that an agreement purports to assign goodwill along with the trademark is

insufficient."  Id. (citations omitted).  "Rather, courts will look to the 'reality of the transaction'

to determine if goodwill has passed."  Id.

Defendants contend that Plaintiffs did not purchase the name "Doyle" when they purchased the assets of Doyle Consulting. Specifically, Defendants argue that a fair reading of the Asset Purchase Agreement signifies that the parties never intended that the name "Doyle" would be construed as a derivative of "Doyle Consulting." (All Defs.' Mot. Dismiss 12-13.) Accordingly, Defendants conclude that Plaintiffs' effort to restrict Doyle from using his own name is "a bad faith effort to stifle appropriate competition." (Id. at 14.)

Defendants' argument is not well-founded under a plain language interpretation of the Asset Purchase Agreement. Section 2.1 states:

> Sellers [Doyle Consulting] shall sell, convey, assign, transfer and deliver to Buyer [Brown & Brown] . . . all of Sellers' respective right, title and interest in and to all of Sellers' respective property and assets, real, personal or mixed, tangible and intangible, of every kind and description, where located, including the following . . . (collectively, the "Acquired Assets"):

> (f)     *Intangible Property*.  All of the intangible rights and property of Sellers, ***including Intellectual Property Assets***, going concern value, goodwill, telephone, facsimile and e-mail addresses and listings and those items listed in Schedule 4.16.

(Defs.' Mot. Dismiss, Ex. A. § 2.1 (emphasis added).) The Agreement goes on to define "Intellectual Property" and "Intellectual Property Assets" in part as "all trademarks, service marks, trade dress, logos, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith," as well as "all registered domain names, website content, website related software, and all other Internet related tools and applications." (Id. § 1.1.) Finally, in Section 7.11, the Agreement specifies that:

32

> Promptly after the Closing, each Seller agrees to cease all operational use of such ***Seller's corporate name, fictitious names, or any derivatives thereof*** (though Sellers shall be entitled to the use of such names in connection with the winding-down of its affairs or its liquidation, including collecting Sellers' Accounts Receivable outstanding as of the Closing). Each Seller shall, no later than three (3) Business Days after the Closing Date, (a) amend its Governing Documents and take all other actions necessary to change its name to one sufficiently dissimilar to such Seller's name, in Buyer's reasonable judgment, to avoid confusion and (b) take all actions reasonably requested by Buyer to enable Buyer to change its name to, or file a fictitious name registration or similar instrument for, such Seller's present name. Buyer agrees to relinquish and assign to Doyle all rights to Sellers' corporate names, fictitious names and derivatives thereof, and to take all actions reasonably requested by Doyle to enable Doyle or an Affiliate thereof to utilize such names, at such time in the future that Buyer and its Affiliates cease all use of such names.

(Id. § 7.11 (emphasis added).)

Under a reasonable reading of this language, the Court can fairly infer that the parties intended the name "Doyle" to be considered a derivative of the business name "Doyle Consulting" and, thus, part of the Asset Purchase Agreement. Defendants' contrary arguments are unavailing. First, while Defendants emphasize the fact that Section 1.1 never explicitly mentions the name "Doyle" in its definition of "Intellectual Property Assets," it is telling that *no* specific names are mentioned in this definition – even the name "Doyle Consulting," which both parties agree is part of the Acquired Assets. Rather, the provision uses the broad terms of "trademarks" and "service marks," together with all "translations, adaptations, derivations, ***and combinations*** thereof." (Id. § 1.1 (emphasis added).) Giving this provision its plain meaning, it suggests that the Agreement intends to include trademarks, such as "Doyle Consulting," as well as all *derivations and combinations* thereof, such as "Doyle Alliance."[8]

_____

[8] Defendants make the somewhat nonsensical argument that, under Plaintiffs' logic, any portion of the name "Doyle Consulting Group, Inc." – *i.e.* "Doyle," "Consulting," "Group," or "Inc." –

Moreover, Defendants make a misplaced attempt to read Section 7.11 as expressly recognizing a release of Sellers' corporate names to Francis Doyle. By the explicit language of the Agreement, Plaintiffs agreed to allow Mr. Doyle to use "Doyle Consulting" or any of its derivatives only if Plaintiffs "ceased all use of such names." (Id. § 7.11.) As Defendants have failed to come forward with any showing that Plaintiffs have in fact ceased use of the name Doyle, and in light of Plaintiffs' contrary allegations, the Court cannot find that any right to the Doyle name for purposes of the insurance industry has reverted back to Francis Doyle.

Finally, Defendants' reliance on Section 4.16(a) of the Agreement, together with Schedule 4.16, has no import on this litigation. Section 4.16 of the APA provides that:

> Sellers and Doyle, jointly and severally, represent and warrant to Buyer (with respect to any representations or warranties regarding Mullin, to the Knowledge of Doyle) as follows:

> (a)     Except as set forth on Schedule 4.16, no Seller has any trade name, service mark, patent, copyright, trademark, website, or proprietary or licensed Software, whether or not any such item is registered, related to its business.

> (b)     Sellers have the right to use the Intellectual Property listed in Schedule 4.16 and such other Intellectual Property owned or used by Sellers, and except as otherwise set forth therein, the Intellectual Property is, and will be on the Effective Date, free and clear of all royalty obligations and Encumbrances.

(Id. § 4.16(a)-(b).) Defendants argue that "while the parties reference 'trademarks' and 'service marks,' in [this section], the parties acknowledge that Doyle Consulting did not possess any

---

could be considered a derivative of the original trademarked name. This reasoning is foreclosed by prevailing Supreme Court jurisprudence, which notes that generic marks – such as "consulting," "group," or "inc." – are simply not registrable as trademarks. Two Pesos, 505 U.S. at 768. Accordingly, the only portion of the name that could legally be included in the definition of "Intellectual Property" is the word "Doyle."

'trade name, service mark, patent, copyright, trademark, website, or proprietary or licensed software,' other than what the parties identified in Schedule 4.16 of the Agreement. . . . Notably, the only Intellectual Property asset in Schedule 4.16 is the web address 'www.doylegroupinc.com.'" (All Defs.' Mot Dismiss 13-14.)  As correctly noted by Plaintiffs, however, the definition of "Intangible Property" assets purchased by Plaintiffs includes "***[a]ll*** of the intangible rights and property of Sellers, including Intellectual Property Assets, going concern value, goodwill, telephone, facsimile and e-mail addresses and listings ***and*** those items listed in Schedule 4.16." (Id. Ex. A. § 2.1 (emphasis added).)  As such, the purchased assets are not limited to those licensed or registered items enumerated in Schedule 4.16, but include "all translations, adaptations, derivations, and combinations" of such items.[9]  Id. § 1.1.

In sum, Defendants do not appear to dispute that Plaintiffs own a valid and protectable service mark over the name "Doyle Consulting," as conveyed by the Asset Purchase Agreement. A reasonable reading of that Agreement suggests that the parties intended that Plaintiffs would purchase all derivatives of that name, which would include the word "Doyle" or the name "Doyle Consulting" for use within the insurance brokerage industry.  For purposes of the Motion to Dismiss, the Court construes the language of the Agreement in Plaintiffs' favor and finds that Plaintiffs did indeed possess an ownership interest in the name "Doyle," as is required for their

_____

[9]  Defendants offer the argument that the opening paragraph of the Agreement identifies the "shareholders" of Doyle Consulting and specifically identifies Frank Doyle as "Doyle."  They go on to reason that, "[r]ead in conjunction with Section 7.11, this inclusion signified that the parties never intended that the name Doyle would be construed as a derivative of Doyle Consulting and that it would be construed as a stand-alone term."  (All Defs.' Mot. Dismiss 13.)  The Court fails to see how this argument bolsters Defendants' position.  Simply because the Agreement referenced Frank Doyle as "Doyle" does not mean the trade name "Doyle" was not part of the Asset Purchase.

Lanham Act claim.

**c.      Likelihood of Confusion**

In a last-ditch effort to undermine the viability of Plaintiffs' Lanham Act claim,

Defendants contend that the Complaint does not provide sufficient factual detail to show that

there is a likelihood of confusion between the names Doyle Alliance and Doyle Consulting.

Defendants go on to argue that, "[a]t its essence, it is obvious that the name Doyle Alliance, and

the domain name 'http://doylealliancegroup.com' are not confusingly similar to the name Doyle

Consulting, the domain name '@doyleconsultinggroup.com' and/or its derivative

'@dcgbenefits.com.'" (All Defs.' Mot. Dismiss 14-15.)  Because the name Doyle Alliance is not,

on its face, sufficiently similar to the name Doyle Consulting, Defendants claim that Plaintiffs'

likelihood of confusion argument must fail as a matter of law.  (Id. at 16.)

Again, the Court finds no merit to Defendants' reasoning.  "A 'likelihood of confusion'

exists when 'consumers viewing the mark would probably assume that the product or service it

represents is associated with the source of a different product or service identified by a similar

mark.'"  Everett Lab., Inc. v. Vertical Pharm., Inc., 227 Fed. Appx. 124, 127 (3d Cir. 2007)

(quoting A & H Sportswear, Inc., 237 F.3d at 211).  The marks need not be identical, just

"confusingly similar."  Fisons Horticulture, Inc. v. Vigoro Indus., 30 F.3d 466, 477 (3d Cir.

1994) (internal quotes omitted).  Although there are two types of "likelihood of confusion"

claims, only the "direct confusion" claim is at issue here.  Freedom Card, Inc. v. J.P. Morgan

Chase & Co., 432 F.3d 463, 470 (3d Cir. 2005).  "The essence of a direct confusion claim is that

a junior user of a mark attempts to free-ride on the reputation and goodwill of the senior user by

36

adopting a similar or identical mark." Id.  Because it is difficult to find, evidence of *actual*

confusion is not required to prove likelihood of confusion.  Versa Prods., Inc. v. Bifold Co.

(Mfg.) Ltd., 50 F.3d 189, 205 (3d Cir. 1995); Fisons, 30 F.3d at 476 ("[W]hile evidence of actual

confusion would strengthen plaintiff's case, it is not essential.").

In deciding whether similar marks create a likelihood of confusion, the Third Circuit has

set forth a non-exhaustive list of ten factors to consider where direct confusion is alleged.

Freedom Card, 432 F.3d at 470-71 (citing Interpace Corp. v. Lapp, Inc., 721 F.2d 460 (3d Cir.

1983)).  These factors include:  (1) the degree of similarity between the owner's mark and the

alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other

factors indicative of the care and attention expected of consumers when making a purchase; (4)

the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7)

whether the goods, though not competing, are marketed through the same channels of trade and

advertised through the same media; (8) the extent to which the targets of the parties' sales efforts

are the same; (9) the relationship of the goods in the minds of consumers because of the

similarity of function; (10) other factors suggesting that the consuming public might expect the

prior owner to manufacture a product in the defendant's market, or that he is likely to expand

into that market.  Id.  This test is qualitative; not all factors are relevant in all cases; and different

factors may be given different weights depending on the particular circumstances of the case.

Basketball Mktg. Co. v. FX Digital Media, Inc., 257 Fed. Appx. 492, 494 (3d Cir. 2007).

Notably, however, "[i]f products are directly competing, and the marks are clearly very similar, a

district judge should feel free to consider only the similarity of the marks themselves" and need

not consider the remaining <u>Lapp</u> factors.  <u>A & H Sportswear</u>, 237 F.3d at 214.  Ultimately, likelihood of confusion is, at its core, a question of fact.  <u>Id.</u> at 237.  As such, a motion to dismiss on this issue will only be granted if the defendant can establish that "no reasonable factfinder could find a likelihood of confusion on any set of facts that plaintiff could prove."  <u>Qwest Commc'ns, Int'l v. Cyber-Quest, Inc.</u>, 124 F. Supp. 2d 297, 304 (M.D. Pa. 2000).

Under this jurisprudence, the Court has little trouble concluding that Plaintiffs have adequately alleged a likelihood of confusion.  While Defendants argue, under the third <u>Lapp</u> factor, that the potential of confusion is lessened by the care and attention expected of consumers of insurance products, (All Defs.' Mot. Dismiss 15 (citing cases which state that consumers of insurance products exercise heightened care)), the remaining relevant <u>Lapp</u> factors weigh heavily in Plaintiffs' favor.  First, and most importantly, there is a high degree of similarity between the names "Doyle Consulting" and "Doyle Alliance," particularly given that the two companies are direct competitors in the insurance industry and service the same region.  The name "Doyle" is the defining term of the mark, whether paired with either the generic term "consulting" or the equally generic term "alliance."  Second, according to the allegations of the Complaint, Plaintiffs' mark is strong, as the term "Doyle" has created a loyal following customers for insurance brokerage services.  (Compl. ¶ 34.)  Third, both Doyle Consulting, as owned by Plaintiffs, and Doyle Alliance, as represented by Defendants, are engaged in the identical types of services, thus creating an inference in the minds of consumers that their services are related.  Finally, the Complaint has alleged that the targets of the parties' sales efforts are functionally the same.  Given these considerations, the Court finds that Plaintiffs have adequately pled likelihood of confusion and declines to dismiss the Lanham Act claim.

### d.   Viability of Lanham Act Claim as to Defendants Tola and Cola

Finally, Defendants assert that even if the Court maintains the Lanham Act claims

overall, it should dismiss the claims as to Defendants Tola and Cola since they were not parties

to the Asset Purchase Agreement, did not sell the name "Doyle," and did not act outside the

scope of their employment.  According to Defendants, such individual Defendants cannot be

responsible for a Lanham Act violation.

The very foundation of Defendants' argument, however, is flawed.  The Lanham Act

specifically provides that:

> ***Any person*** who, on or in connection with any goods or services, or any container
> for goods, uses in commerce any word, term, name, symbol, or device, or any
> combination thereof, or any false designation of origin, false or misleading
> description of fact, or false or misleading representation of fact, which–
>
> > **(A)** is likely to cause confusion, or to cause mistake, or to deceive as to the
> > affiliation, connection, or association of such person with another person,
> > or as to the origin, sponsorship, or approval of his or her goods, services,
> > or commercial activities by another person, or
> >
> > **(B)** in commercial advertising or promotion, misrepresents the nature,
> > characteristics, qualities, or geographic origin of his or her or another person's
> > goods, services, or commercial activities,
>
> ***shall be liable in a civil action*** by any person who believes that he or she is or is
> likely to be damaged by such act.

15 U.S.C.A. § 1125 (emphasis added).  Under the Lanham Act, "[a] corporate officer is

individually liable for the torts he commits and cannot shield himself behind a corporation when

he is an actual participant in the tort."  <u>Donsco, Inc. v. Casper, Corp.</u>, 587 F.2d 602, 606 (3d Cir.

1978) (corporate officer held liable for Lanham Act violation where he had a significant

involvement in the unlawful conduct, was a central figure in the corporation, and authorized and approved the acts of unfair competition which were the basis of the corporation's liability); see also Homenexus, Inc. v. Directweb, Inc., No. CIV.A.99-2316,1999 WL 959823, at *3 (E.D. Pa. Oct. 14, 1999) (declining to dismiss Lanham Act claim against individual corporate officer).

The Complaint expressly alleges, upon information and belief, that Cola and Tola, using the "Doyle" mark, may have been diverting customers from Brown & Brown to Doyle Alliance. (Compl. ¶¶ 100-101.) It goes on to assert that although all Defendants understood the name "Doyle Consulting Group" to be of value in the mid-Atlantic insurance industry, they disregarded the Asset Purchase Agreement and did business under the name "Doyle Alliance Group," which is a derivative of the name "Doyle Consulting Group." (Id. ¶¶ 111-12.) Finally, Plaintiffs claim that all Defendants used both the name "Doyle Alliance Group" and the internet domain name "doylealliancegroup.com" in order to cause confusion and deceive the insurance-purchasing public as to their affiliation with Brown & Brown. (Id. ¶ 114.) The fact that neither Tola nor Cola was a signatory to the Asset Purchase Agreement is irrelevant. Their alleged participation in the Lanham Act violation subjects them to liability under that statute.

## 2. Whether the Court Has Supplemental Jurisdiction Over the State Law Claims

Defendants next contend that the Court should decline to exercise supplemental jurisdiction over the remainder of Plaintiffs' state law claims. This argument, however, is premised on the mistaken notion that the Court would dismiss the Lanham Act claims, leaving no basis for federal subject matter jurisdiction. Given that the Lanham Act claims remain in this case, the Court's analysis of whether to exercise supplemental jurisdiction over the remaining

state law claims differs significantly from that offered by Defendants.

28 U.S.C. § 1367(a) provides that:

Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a). Subsection (c) goes on to state that

The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if--
(1) the claim raises a novel or complex issue of State law,
(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
(3) the district court has dismissed all claims over which it has original jurisdiction, or
(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C.A. § 1367(c).

In the present case, the Court clearly has subject matter jurisdiction over this case under 28 U.S.C. § 1331, given the presence of the federally-based Lanham Act claims. Moreover, none of the circumstances set forth in 28 U.S.C. § 1367(c) apply, as there are no novel or complex issues of state law, the state law claims do not predominate over the Lanham Act, a federal claim remains in the case, and there are no other compelling reasons for declining jurisdiction. Therefore, the Court denies Defendants' Motion to Dismiss for lack of subject matter jurisdiction.

**B.      Whether Plaintiffs' State Law Tort Claims Against Defendants Cola and Tola Are Barred by the "Gist of the Action" Doctrine**

Defendants' second broad argument seeks dismissal of all of Plaintiffs' state claims against Defendants Cola and Tola[10] under the "gist of the action" doctrine.  In particular, they argue that, pursuant to this doctrine, Plaintiffs' state tort claims are subsumed by their single breach of contract action.

As a general rule, Pennsylvania courts are cautious about permitting tort recovery on contractual breaches.  Glazer v. Chandler, 200 A.2d 416, 418 (Pa. 1964).  In eToll, Inc. v. Elias/Savion Adver., Inc., 811 A.2d 10 (Pa. Super. Ct. 2002), the Pennsylvania Superior Court emphasized that the "gist of the action" doctrine "is designed to maintain the conceptual distinction between breach of contract claims and tort claims [by] preclud[ing] plaintiffs from recasting ordinary breach of contract claims into tort claims."  Id. at 14.[11]  The simple existence of a contractual relationship between two parties does not preclude one party from bringing a tort claim against the other.  Id.; see also Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc., 247 F.3d 79, 104 (3d Cir. 2001).  The doctrine, however, forecloses a party's pursuit of a tort action for the mere breach of contractual duties, "'without any separate or independent event giving rise to the tort.'"  Smith v. Lincoln Benefit Life Co., No. CIV.A.08-1324, 2009 WL 789900, at *20 (W.D. Pa. Mar. 23, 2009) (quoting Air Prods. and Chems., Inc. v. Eaton Metal Prods. Co., 256 F.

---

[10]  Notably, Defendants do not seek dismissal of any tort claims against Defendant Brown & Brown under the gist of the action doctrine.

[11]  Although the Pennsylvania Supreme Court has not explicitly adopted the gist of the action doctrine, both the Pennsylvania Superior Court and multiple United States District Courts have predicted that it will.  Woods v. ERA Med LLC, No. CIV.A. 08-2495, 2009 WL 141854, at *6 n.11 (E.D. Pa. Jan. 21, 2009) (citing cases).

Supp. 2d 329, 340 (E.D. Pa. 2003)), aff'd, 2010 WL 3730196 (3d Cir. Sep. 24, 2010).

"When a plaintiff alleges that the defendant committed a tort in the course of carrying out a contractual agreement, Pennsylvania courts examine the claim and determine whether the 'gist' or gravamen of it sounds in contract or tort." Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc., 40 F. Supp. 2d 644, 651 (W.D. Pa. 1999). To make this determination, the court must ascertain the source of the duties allegedly breached. Sunburst Paper, LLC v. Keating Fibre Int'l., No. CIV.A.06-3957, 2006 WL 3097771, at *2 (E.D. Pa. Oct. 30, 2006). The doctrine bars tort claims: "(1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract." Id. (citing eToll, 811 A.2d at 19). "In other words, if the duties in question are intertwined with contractual obligations, the claim sounds in contract, but if the duties are collateral to the contract, the claim sounds in tort." Id. Whether the gist of the action doctrine applies in any particular setting is a question of law. Alexander Mill Servs., LLC v. Bearing Distrib., Inc., No. CIV.A.06-1116, 2007 WL 2907174, at *8 (W.D. Pa. Sep. 28, 2007).

In the present case, Defendants argue that Plaintiffs' claims against Defendants Tola and Cola for breach of fiduciary duty/duty of loyalty, tortious interference, conversion, and misappropriation are barred by the gist of the action doctrine. The Court considers each claim individually.

43

1.      **Breach of Fiduciary Duty/Duty of Loyalty**

Defendants first contend that the claim for breach of fiduciary duty/duty of loyalty is precluded by the gist of the action doctrine because the duties at issue arise expressly from the Employment Agreements with Cola and Tola.  The Court agrees.

"A breach of fiduciary duty claim is barred by the gist of the action doctrine if the fiduciary duty alleged is grounded in contractual obligations."  Alpart v. Gen. Land Partners, Inc., 574 F. Supp. 2d 491, 499 (E.D. Pa. 2008).  In Bohler-Uddeholm Am., Inc. v. Ellwood Group, supra, however, the Third Circuit recognized that many obligations arising under a fiduciary duty are imposed "'as a matter of social policy' rather than 'by mutual consensus.'"  247 F.3d at 105. These "'larger social policies [are] embodied in the law of torts' rather than 'the terms of the contract.'"  Id.  The same holds true for obligations under the duty of loyalty.  Orthovita, Inc. v. Erbe, No. CIV.A.07-2395, 2008 WL 423446, at *7 (E.D. Pa. Feb. 14, 2008).  Thus, "claims for breach of fiduciary duty and breach of contract can coexist if the fiduciary duty is based on duties imposed as a matter of social policy and if the fiduciary duty is not based on a contractual agreement between the parties."  Alpart, 574 F. Supp. 2d at 499; see also Bohler-Uddeholm, 247 F.3d at 105 (declining to dismiss breach of fiduciary duty claim under gist of the action doctrine where the obligations that plaintiff alleged that defendant breached in its fiduciary duty claim were imposed "as a matter of social policy" rather than "by mutual consensus.").  In the context of a single case, some allegations of breach of fiduciary duty may be barred by the gist of the action doctrine, while others may be deemed to be outside the scope of the contract at issue.

In the case at bar, the gravamen of Plaintiffs' breach of fiduciary duty/breach of loyalty

claims is a breach of contract action.  Specifically, the sole counts of the Complaint referencing

any breach of fiduciary duty or duty of loyalty state:[12]

> 93.    Upon information and belief, Cola and Tola each, *in violation of their contractual restrictions and their fiduciary duties and duties of loyalty* to Brown-Pa. and Grinspec, respectively planned and organized a business activity to compete with plaintiffs while they were still employed by plaintiffs.
>
> . . .
>
> 101.    Cola and Tola have *breached their Employment Agreements* and otherwise unlawfully solicited numerous customers of plaintiffs to leave plaintiffs and do business with Doyle Alliance.  Upon information and belief, some such solicitations may have occurred while Cola and Tola were still employed by *and owed a fiduciary duty and duty of loyalty* to plaintiffs.

(Compl. ¶¶ 93, 101 (emphasis added).)  As is evident from the plain language of these

allegations, the breach of fiduciary duty/breach of loyalty claims are nothing more than a

restatement of Plaintiffs' breach  of contract claim.  In other words, the obligations that Plaintiffs

claim were breached by Cola and Tola were imposed by "mutual consensus" rather than "as a

matter of social policy," and are thus inextricably intertwined with the contracts.  Plaintiffs put

forth no allegations of breach of fiduciary duty or duty of loyalty that transcend or exist outside

Cola's and Tola's obligations under the Employment Agreements.  <u>See</u> <u>Ginley v. E.B. Mahoney</u>

<u>Builders, Inc., Edwin B. Mahoney</u>, No. CIV.A.04-1986, 2005 WL 27534, at *3 (E.D. Pa. Jan. 5,

2005) ("Because Plaintiffs' fiduciary duty claim arises directly from Defendants' failure to

satisfy their contractual obligations, the 'gist of the action' plainly sounds in contract law, rather

than tort.").  Therefore, the gist of the action bars these allegations and Defendants' Motion to

---

[12]  Notably, Plaintiffs' allegations about Cola and Tola after they left Plaintiffs' employment are irrelevant to the fiduciary duty/duty of loyalty claims since they no longer owed any such duties once that employment ended.

Dismiss these claims is granted.

## 2. Tortious Interference Claims

Counts VII and VIII of Plaintiffs' Complaint assert causes of action against all Defendants for tortious interference with contractual and business relationships with Plaintiffs' customers, and with contractual relations with respect to Plaintiffs' employees. Defendants contend that these claims, as against Defendants Tola and Cola, are nothing more than an effort to re-cast their breach of contract claims into separate tort claims. Again, the Court finds merit to Defendants' argument.

Pennsylvania courts, following the Restatement (Second) of Torts, define the tort of intentional interference with existing contractual relations as:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss to the other from the third person's failure to perform the contract.

Binns v. Flaster Greenberg, P.C., 480 F. Supp. 2d 773, 778 (E.D. Pa. 2007) (quoting Adler, Barish, Daniels, Levin and Creskoff v. Epstein, 393 A.2d 1175, 1183 (Pa. 1978)). In order to prevail on a claim for interference with contractual relations, the plaintiff must plead and prove four elements: (1) the existence of a contractual relation; (2) the defendant's purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) the absence of any privilege or justification on the part of the defendant; and (4) damages resulting from the defendant's conduct. Gundlach v. Reinstein, 924 F. Supp. 684, 693 (E.D. Pa. 1996). "A tortious interference with contract claim is barred by the gist of the action doctrine if it is not independent of a contract

claim that is pled along with it." <u>Alpart</u>, 574 F. Supp. 2d at 505.

Plaintiffs' tortious interference claims allege that Cola and Tola have interfered with two separate sets of contracts. First, in Count VII, Plaintiffs claim that Cola and Tola willfully and knowingly interfered, and are continuing to interfere, with Plaintiffs' customer relationships. Clearly, this claim is subsumed by Plaintiffs' breach of contract claim. As set forth above, both Tola and Cola's Employment Agreements specifically contained provisions regarding non-solicitation of customers that prohibited them from directly or indirectly soliciting or inducing any existing or prospective customers of Brown & Brown, Brown-PA (for Cola), or Grinspec (for Tola). (Compl. ¶¶ 38, 50.) Accordingly, any tort allegation that Cola or Tola interfered in such customer contracts is governed entirely by the Employment Agreement and, in turn, barred by the gist of the action doctrine.

Plaintiffs' second tortious interference claim against Cola and Tola avers that the two individual Defendants "solicited each other and are soliciting or attempting to solicit other employees of plaintiffs, to intentionally induce them to breach their respective Employment Agreements with plaintiffs by contacting, soliciting and accepting business from plaintiffs' customers on behalf of Doyle Alliance Group, and by misusing and disclosing plaintiffs' confidential information." (<u>Id.</u> ¶ 166.) Yet again, however, this precise conduct falls squarely within the scope of Cola's and Tola's respective Employment Agreements. Tola and Cola agreed that, both during their employment with Grinspec and Brown-PA respectively and for two years after the cessation of such employment, they would not, directly or indirectly, solicit employees of Grinspec (Tola only), Brown-PA (Cola only), or Brown & Brown to work for a competitor. (<u>Id.</u> ¶¶ 44, 56.) As such, any allegation that they engaged in such solicitation does

not implicate tort concerns, but rather falls within the bounds of the Defendants' Employment Agreements.[13]  To that end, these claims are likewise dismissed under the gist of the action doctrine.

### 3. Conversion Claim

Conversion is defined as "the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification." Leonard A. Feinberg, Inc. v. Cent. Asia Capital Corp., Ltd., 974 F. Supp. 822, 844-45 (E.D. Pa. 1997) (citation omitted).  Although "[t]he mere existence of a contract between the parties does not automatically foreclose the parties from raising a tort action[,] . . . a party cannot prevail on its action of conversion when the pleadings reveal merely a damage claim for breach of contract." Neyer, Tiseo & Hindo, Ltd. v. Russell, No. CIV.A.92-2983, 1993 WL 53579, at *4 (E.D. Pa. Mar. 2, 1993) (internal citations omitted).  Courts have dismissed conversion claims under the gist of the action doctrine where the alleged entitlement to the chattel arises solely from the contract between the parties.  Rahemtulla v. Hassam, 539 F. Supp. 2d 755, 777 (M.D. Pa. 2008) (citing Murphy v. Mid East Oil Co., No. CIV.A.06-1343, 2007 WL 527715, at *5-6 (W.D. Pa. Feb.14, 2007) (dismissing conversion claim because it was dependent on the defendant's

---

[13]  Plaintiffs argue that "[t]he fact that Cola promised Brown-Pa. that he would not solicit its employees has no bearing on his liability to Grinspec for tortiously interfering with its contractual relationship with Tola, and vice versa.  The two agreements are independent of one another, and the gist of the action doctrine does not apply."  (Pls.' Resp. All Defs.' Mot. Dismiss 25.)  Plaintiffs' argument fails on two grounds.  First, Brown-PA and Grinspec are subsidiaries of Brown & Brown, effectively making both Tola and Cola employees of Brown & Brown, as well as of their respective subsidiary.  In turn, their solicitation of each other falls with the non-solicitation provision of their Employment Agreements.  Second, Plaintiffs' tortious interference claim alleges that Cola and Tola solicited other employees of the Plaintiff companies – an action expressly covered by both Employment Agreements.

noncompliance with the terms of the agreements); <u>Montgomery v. Fed. Ins. Co.</u>, 836 F. Supp.

292, 301-02 (E.D. Pa. 1993) (dismissing conversion claim because of, *inter alia,* the "firmly

accepted . . . doctrine that an action for conversion will not lie where damages asserted are

essentially damages for breach of contract"); <u>Pittsburgh Constr. Co. v. Griffith</u>, 834 A.2d 572,

584 (Pa. Super. Ct. 2003) (stating that where success of the conversion claim "depend[s] entirely

on the obligations as defined by the contract," the "gist of the action" doctrine applies)).

Notably, however, "[w]hen a plaintiff has a property interest in the thing that is the

subject of a [conversion] claim, the gist of the action doctrine does not bar recovery under a

conversion theory even though the property may also be the subject of a contract." <u>Orthovita</u>,

2008 WL 423446, at *6 (citing <u>Berger</u>, 153 F. Supp. 2d at 753-54 (holding that conversion claim

was not barred when plaintiff had property interest in proceeds that were both the subject of the

breach of contract and conversion claims)). In <u>Partners Coffee Co., LLC v. Oceana Servs. &</u>

<u>Prods. Co.</u>, No. CIV.A.09236, 2009 WL 4572911, at *6-7 (W.D. Pa. Dec. 4, 2009) – a case

relied upon by Plaintiffs – the Court clarified the distinction between claims of conversion that

are barred by the gist of the action doctrine and those that are not.  Following an asset purchase

agreement between two competing companies, similar to the present case, the plaintiff came to

believe that the defendant had intercepted and diverted payments due to plaintiff, contacted

customers to compete for services, and surreptitiously installed a computer device which allowed

him to log into plaintiff's computer system and obtain confidential business information and

trade secrets.  <u>Id.</u> at *6.  The court found that the first two parts of that conversion claim

(diverting payments and contacting customers) were intertwined with the terms of the Asset

Purchase Agreement since the contract defined which company owned these items.  <u>Id.</u>  It

declined, however, to find that the third part of the conversion claim, i.e., that defendants improperly accessed the plaintiff's computer system in order to gain confidential business information, "to be intertwined with any contract provision since it is understood in our society that businesses will not interfere with each other's confidential information whether bound to each other by contract or not."  Id. at *7; see also United States v. Al Hedaithy, 392 F.3d 580, 594 (3d Cir. 2004) (quoting Carpenter v. United States, 484 U.S. 19, 26 (1987) for the principle that "'[c]onfidential information acquired or compiled by a corporation in the course and conduct of its business is a species of property to which the corporation has the exclusive right and benefit' . . . [s]uch information includes trade secrets").

To the extent Plaintiffs' claim alleges that Defendants have converted documents, information, marketing materials, and promotional materials, societal norms, not the parties' contracts, govern the ownership of these items and recognize that they belong exclusively to Plaintiffs.  When, as here, a plaintiff has a property interest in the thing subject to the conversion claim, the gist of the action doctrine does not bar a tort theory of recovery, despite the fact that the property is also the subject of a separate contract.  In other words, Tola and Cola's duty to not take these items stemmed not from any contractual obligation, but rather from social policy existing outside the terms of the contract.  With respect to this portion of the conversion claim, the Court declines to grant the Motion to Dismiss.

To the extent, however, that Plaintiffs allege that Defendants Tola and Cola have converted customers and business, Plaintiffs have no express property interest in these items. Rather, the right to such customers and business is governed entirely by the Employment Agreements, which prohibited Defendants Tola and Cola, during their employment and for a

period of two years thereafter, from soliciting any existing or prospective customers of Plaintiffs. Under such circumstances, the claim of conversion of customers and business is inextricably intertwined with the Employment Agreements. As to this portion of the conversion claim, the Court grants the Motion to Dismiss.

### 4. __Misappropriation Claims__

As repeatedly noted above, the focus of an analysis under the "gist of the action" doctrine is "whether actions lie from a breach of the duties imposed as a matter of social policy or from the breach of duties imposed by mutual consensus." Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc., 530 F.3d 204, 229 (3d Cir. 2008) (internal quotations omitted). While the gist of the action doctrine may bar misappropriation claims arising solely from the written agreement between the parties, where the purported misrepresentation extends beyond a failure to adhere to any provision of the contract, the claim sounds primarily in tort and may be maintained concurrently with the breach of contract action. FedEx Ground Package Sys., Inc. v. Applications Int'l. Corp., No. CIV.A.03-1512, 2008 WL 4279751, at *12 (W.D. Pa. Sep. 12, 2008).

Plaintiffs' misappropriation claim in this case is three-fold: misappropriation of business/customers (Count IX); misappropriation of confidential and proprietary information (Count X); and misappropriation of property (Count XI). As to the first count, misappropriation of business/customers, the analysis is identical to that under the conversion claim. Plaintiffs had no clear property interest in particular customers or business. Thus, Defendants' alleged misappropriation of these items would constitute only a breach of duties imposed by mutual

51

consensus and not a breach of duties imposed as a matter of social policy. Therefore, Count IX must therefore be dismissed under the gist of the action doctrine.

The Court reaches a different conclusion, however, with respect to the claims of misappropriation of confidential trade secrets and misappropriation of property. The elements of a misappropriation of trade secrets claim in Pennsylvania are: "(1) the existence of a trade secret; (2) communication of the trade secret pursuant to a confidential relationship; (3) use of the trade secret, in violation of that confidence; and (4) harm to the plaintiff." Moore v. Kulicke & Soffa Indus., Inc., 318 F.3d 561, 566 (3d Cir. 2003). "One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if . . . his disclosure or use constitutes a breach of confidence." Id. at 566 n.3. Therefore, "the tort of misappropriation of trade secrets is based on a violation of a non-contractual duty to retain confidences, which is imposed as a matter of social policy rather than by mutual consensus." FedEx Ground Package Sys., 2008 WL 4279751, at *11. Although Tola and Cola, in this case, were contractually bound to not use Plaintiffs' proprietary information, the obligations underlying Plaintiffs' claim for misappropriation of trade secrets and proprietary information exist independently of Defendants' contracts. As such, this claim sounds in tort and is not barred by the gist of the action doctrine.

As to the claim of misappropriation of property, Plaintiffs allege that Defendants stole and misappropriated files, documents, and other property belonging to Plaintiffs. (Compl. ¶¶ 185-186.) Similar to the conversion claim, there is no dispute governed by the Employment Agreements as to the ownership of these items – Plaintiffs have an express property interest in them. Defendants' duty to not misappropriate these items thus arises out of a broader social policy embodied in the law of torts and not from any mutual consensus. Accordingly, the Court

declines to dismiss this Count of the misappropriation claim.

**C.      Whether the Breach of Fiduciary Duty/Duty of Loyalty Claims Against Cola and Tola Must Be Dismissed**

Defendants next aver that Plaintiffs' Count V cause of action for breach of fiduciary duty and/or duty of loyalty fails as a matter of law.  Specifically, it asserts that Defendants Tola and Cola were only *officers* of Plaintiffs and Pennsylvania imposes fiduciary duties only upon *directors* of a corporation.

The Court, however, has already dismissed this Count against Defendants Tola and Cola under the gist of the action doctrine.  Accordingly, we decline to reach the merits of this argument.

**D.      Whether the Claim for Unjust Enrichment Must Be Dismissed**

Defendants Cola and Tola also challenge the legal validity of Plaintiffs' unjust enrichment claim.  They contend that a claim for unjust enrichment must be dismissed on a Rule 12(b)(6) motion where the allegations make clear that an express contractual agreement exists between the parties.  While the Court agrees with the legal foundation of Defendants' argument, we find that such dismissal is premature.

An action based on unjust enrichment is an equitable action which sounds in quasi-contract, a contract implied in law.  Sevast v. Kakouras, 915 A.2d 1147, 1153 n.7 (Pa. 2007).  A plaintiff who claims unjust enrichment must "'show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that would be unconscionable for the party to retain without compensating the provider.'"  Bair v. Purcell, 500 F. Supp. 2d 468,

499 (M.D. Pa. 2007) (quoting Hershey Foods Corp. v. Ralph Chapek, Inc., 828 F.2d 989, 999 (3d Cir. 1987)).  Under Pennsylvania law, the elements of a claim for unjust enrichment are:  (1) the plaintiff conferred a benefit upon the defendant; (2) an appreciation of such a benefit by the defendant; and (3) the defendant accepted and retained such benefit under circumstances where it would be inequitable for the defendant to retain the benefit without payment of value.  Global Ground Support, LLC v. Glazer Enter., Inc., 581 F. Supp. 2d 669, 675 (E.D. Pa. 2008).

Nonetheless, it is a well-established rule that the doctrine of unjust enrichment is inapplicable when the relationship between the parties is founded upon written agreements, no matter how "harsh the provisions of such contracts may seem in the light of subsequent happenings."  Wilson Area Sch. Dist. v. Skepton, 895 A.2d 1250, 1254 (Pa. 2006) (quotations omitted).  As previously noted by this Court:

> [This] bright-line rule also has deep roots in the classical liberal theory of contract.  It embodies the principle that parties in contractual privity . . . are not entitled to the remedies available under a judicially-imposed quasi-contract because the terms of their agreement (express or implied) define their respective rights, duties, and expectations.

Curley v. Allstate Ins. Co., 289 F. Supp. 2d 614, 620-21 (E.D. Pa. 2003).

In the present case, had both Plaintiffs and Defendants Tola and Cola unequivocally admitted the existence and enforceability of all provisions of the Employment Agreements, the Court would have to dismiss Plaintiffs' unjust enrichment claim.  The Defendants, however, have, in other filings before the Court, questioned the enforceability of the restrictive covenants contained in the Agreement.  (Def. Cola's Mem. Opp'n Mot. for Prelim. Inj. 4; Def. Tola's Mem. Opp'n Mot. for Prelim. Inj. 4-5.)  In such circumstances, it is improper to dismiss the unjust

enrichment claim.  See Alpart, 574 F. Supp. 2d 491, 507 (E.D. Pa. 2008) (where parties do not

agree on the existence of an express contract, the Federal Rules of Civil Procedure permit

pleading in the alternative and allow a breach of contract claim and unjust enrichment claim to

coexist during the early stages of the litigation); Cornell Cos., Inc. v. Borough of New Morgan,

512 F. Supp. 2d 238, 266 n.19 (E.D. Pa. 2007) ("'Promissory estoppel and unjust enrichment

may be pled in the alternative to a breach of contract claim, although the finding of a valid

contract would prevent a party from recovering for either quasi-contractual theory.'") (quoting

Comcast Spectacor L.P. v. Chubb & Son, Inc., No. CIV.A.05-1507, 2006 WL 2302686, at *23

(E.D. Pa. Aug. 8, 2006)).  Given that the parties have not fully admitted that Defendants Cola and

Tola are subject to the terms of a valid enforceable Employment Agreement, it is premature at

this juncture to dismiss the unjust enrichment claim.  In the event that Defendants choose to

withdraw such challenges, the unjust enrichment claim will be dismissed.

### E.  Whether Plaintiffs' Duplicative Claims Must Be Dismissed

#### 1.  Counts VI and VIII for Tortious Interference with Contractual Relations Against Doyle Alliance

Defendants also assert that Counts VI and VIII of the Complaint are duplicative of one

another and, as such, must be dismissed.[14]  Count VI alleges that Doyle Alliance tortiously

interfered with Cola and Tola's Employment Agreements.  (Compl. ¶¶ 148-156.)  Count VIII

reiterates that Doyle Alliance tortiously interfered with Cola's and Tola's Employment

---

[14]  Defendants appear to mistakenly suggest that Counts VI and VII are duplicative, and Plaintiffs properly respond by identifying the distinctions between such claims.  A fair reading of Defendants' papers, however, reveals that they were actually challenging the identical nature of Counts VI and VIII.

Agreements, and also alleges that Cola and Tola intentionally interfered with each other's Employment Agreements and sought to induce other employees of Plaintiffs to breach their Employment Agreements.  (Id. ¶¶ 164-171.)  As Count VI is completely subsumed into Count VIII, the Court grants Defendants' Motion to Dismiss Count VI.  See Lima-Brito Dias v. WVC St. John, Inc., No. CIV.A.06-195, 2008 WL 789890, at *2 (D.V.I. Mar. 20, 2008) (recognizing authority of court to dismiss duplicative claims); Giannone v. Ayne Inst., 290 F. Supp. 2d 553, 566 (E.D. Pa. 2003) (same).

### 2.    Counts III and XII for Unfair Competition

Defendants similarly assert that Counts III and XII are duplicative.  Specifically, Count III sets forth a claim for "State Unfair Competition" and Count XII sets forth a barebones allegation of "Unfair Competition."  Plaintiffs respond to Defendants' challenge with only the argument that Count XII is "a 'catch-all' claim for unfair competition that incorporates by reference the paragraphs that precede it and includes a claim for punitive damages.  Count XII should be read as an amplification of Counts I and III and be left intact."  (Pls.' Resp. All Defs.' Mot. Dismiss 33.)

Plaintiffs' argument is incorrect.  Counts III and XII are substantively identical, making Count XII nothing more than a duplication of Count III.  Thus, the Court dismisses XII in its entirety.

### F.    Whether Plaintiffs' State Law Unfair Competition Claim Fails

In their final argument, Defendants seek dismissal of Plaintiffs' Pennsylvania unfair competition claim (Count XII) on the same grounds as it requests dismissal of Plaintiffs' Lanham

Act claims.  As the Court has already found that the Complaint states a cause of action for violation of the Lanham Act, Defendants' argument is meritless.  Nonetheless, as set forth above, Count XII is dismissed as duplicative of Count III.

## V.     CONCLUSION

For all of the foregoing reasons, the Court denies Defendant Tola's Motion to Dismiss and rejects the efforts by all of the Defendants to dismiss Plaintiffs' Complaint in its entirety.  As set forth in detail above, however, the Court eliminates some of Plaintiffs' tort claims from this action.  The parties are directed to proceed with discovery in anticipation of the Preliminary Injunction hearing on December 6, 2010.