# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BROWN & BROWN, INC.,        :
BROWN & BROWN OF          :
PENNSYLVANIA, INC. and GRINSPEC,  :
INC.                                :
                                    :       CIVIL ACTION
              Plaintiffs,     :
                                    :
        v.                   :
                                    :
ROBERT COLA, RYAN TOLA, and    :       NO. 10-3898
DOYLE ALLIANCE GROUP,        :
                                    :
            Defendants.    :

## MEMORANDUM

BUCKWALTER, S. J.                                         March 23, 2011

Currently pending before the Court are: (1) Defendant Robert Cola's Motion for Summary Judgment and (2) Defendant Ryan Tola's Motion for Summary Judgment. For the following reasons, the Motions are denied in part with prejudice and in part without prejudice.

## I.      FACTUAL BACKGROUND

Plaintiff Brown & Brown, Inc. ("Brown & Brown") is a national insurance brokerage and service company. (Compl. ¶ 13; Cola Answer ¶ 13; Tola Answer ¶ 13.) Brown & Brown and its subsidiaries, including Pennsylvania corporation Brown & Brown of Pennsylvania, Inc. ("Brown-PA"), and New Jersey corporation Grinspec, Inc. ("Grinspec") (collectively "Plaintiffs"), offer a broad range of insurance and reinsurance products and services, as well as risk management, third-party administration, insurance consulting, and other insurance-related services to both the public and private sectors. (Compl. ¶¶ 13, 15; Cola Answer ¶ 13; Tola Answer ¶ 13.) According to the Complaint, one of the most important ways that Plaintiffs invest in their critical client relationships

is through the training and development of their brokers and producers, who are provided with detailed confidential and proprietary information about Plaintiffs' insurance services, business strategies, pricing, and customers.  (Compl. ¶ 17.)

> **A.**     **Brown & Brown Acquires Doyle Consulting Group, Inc.**

As part of its ongoing strategy to acquire smaller insurance brokers, Brown & Brown identified a network of related businesses in Pennsylvania and New Jersey as potential partners. (Compl. ¶¶ 20-21.)  One particular brokerage business – Doyle Consulting Group, Inc. and Doyle Consulting Group of New Jersey, Inc. (collectively "DCG") – was owned by Frank Doyle and Kevin Mullin.  (Pls.' Resp. Cola Mot. Summ. J., Ex. A, Aff. of Ed Chorzelewski ¶ 2, Aug. 18, 2010 ("Chorzelewski Aff.").)   Following preliminary discussions, Brown & Brown and Doyle Consulting executed an Asset Purchase Agreement through which Brown & Brown and Brown-PA acquired the assets of DCG.  (Pls.' Resp. Cola Mot. Summ. J., Ex. B., Aff. of Thomas Riley, ¶ 3, Aug. 16, 2010 ("Riley Aff."); id. Ex. C.)  Doyle and Mullin were signatories to this Agreement.  (Id. Ex. C.) Plaintiffs purchased the full range of DCG's assets, including, among other things, DCG's current book of business, tangible personal property, seller contracts, governmental authorizations, records, intangible property such as intellectual property, claims against third parties, and good will.  (Riley Aff. ¶ 4.)  Plaintiffs' purchase of intellectual property assets from DCG included all trademarks and trade names, together with all derivatives of such trademarks and trade names.  (Id. ¶ 6.)  The Asset Purchase Agreement required DCG, Doyle, and Mullin to immediately cease using the corporate name "Doyle Consulting" and any other trademarks or trade names, and all derivatives thereof, in their business dealings.  (Id. ¶ 7.)   In consideration for these assets, Brown & Brown agreed to pay DCG an amount in excess of seventeen million dollars.  (Id. ¶ 5.)  The Asset Purchase Agreement deal closed on February 1, 2004.  (Id. ¶ 8.)

After the closing, Frank Doyle joined Brown-PA as its new executive vice president, and the company hired several other former DCG employees. (Chorzelewski Aff. ¶ 3.) All customers and accounts of DCG became customers and accounts of Brown & Brown and its subsidiaries. (Id. ¶ 4.) Brown & Brown and Brown-PA used the name "Doyle Consulting" as a service mark in dealings with customers, employees, and the industry in general. (Id. ¶ 4.) Indeed, numerous previous employees of DCG, including Defendants Robert Cola and Ryan Tola, continued to use the internet domain name "@doyleconsultinggroup" or its derivative "@dcgbenefits.com" in e-mails sent in the ordinary course of performing and/or selling insurance services for Plaintiffs. (Id. ¶ 5.)

**B.** **Facts Relevant to Defendant Robert Cola**

**1.** **Plaintiffs' Hiring of Robert Cola**

Defendant Robert Cola, a resident of Pennsylvania, has worked in the employee benefits industry for more than twenty years. (Def. Cola's Mot. Summ. J., Ex. A, ¶ 3 ("Cola Aff.").) In September of 1996, Cola became an employee of DCG, where he worked for almost eight years, until February of 2004. (Id. ¶ 4.) During that time, he established and developed relationships with DCG's clients and his work was primarily focused in the Pennsylvania and New Jersey regions. (Id. ¶ 6.)

In early 2004, when DCG was to be acquired by Brown & Brown, Cola was directed to sign an employment agreement with Brown & Brown subsidiary, Brown-PA. (Id. ¶ 7.) According to Cola, he was given the Brown-PA employment agreement at 5:00 p.m. on Friday, January 23, 2004, and told to sign it by the end of the day on Monday January 26, 2005. (Id. ¶¶ 8-9.) When Cola expressed some hesitation about the restrictiveness of the agreement and requested time to consult with an attorney, Kevin Mullin, DCG's president, told him it was non-negotiable and that he would no longer be employed if he did not sign it by the end of the day. (Id. ¶¶ 10-11.) Following

unsuccessful efforts to contact his attorney, Cola signed the employment agreement on January 26, 2004 ("Cola Employment Agreement"). (Id. ¶¶ 12-13.)

The Cola Employment Agreement contained a non-solicitation of customers provision prohibiting him from directly or indirectly soliciting or inducing any existing or prospective customers of Brown & Brown and Brown-PA, or any of their affiliates, both during his employment with Brown-PA and for twenty-four months after the termination of his employment. (Riley Aff. ¶ 15.) Plaintiffs interpreted this to mean that for a period of time following cessation of employment, Cola was to have no contact with Brown & Brown customers. (Def. Cola's Mot. Summ. J., Ex. B., Dep. of Ed Chorzelewski, 261:16-262:17, Jan. 10, 2011 ("Chorzelewski Dep.").) This provision did not prevent Cola from working for a competitor, so long as he did not solicit or accept business from Plaintiffs' customers, and he advised any prospective future employers of his contractual non-solicitation obligations. (Riley Aff. ¶ 16.) In addition, Cola expressly agreed not to use or disclose any confidential proprietary information of Brown & Brown or its affiliates both during or after his employment with Brown-PA. Such information included customer lists; insurance carriers; accounts and prospect lists; policy forms and/or rating information; expiration dates; information on risk characteristics; information concerning insurance markets for large or unusual risks; business, selling, and customers' strategies and plans; and customer specifications, such as preferences, practices, idiosyncrasies, pricing minimums and maximums, usual needs, time constraints, names, and addresses. (Id. ¶¶ 16-17.) Cola further contracted that, both during his employment with Brown-PA and for two years after the cessation of such employment, he would not, directly or indirectly, solicit employees of Brown-PA or Brown & Brown to work for a competitor. (Id. ¶ 18.) Finally, Cola agreed that, during his employment with Brown-PA, he would "not undertake the active planning or organizing of any business activity competitive with the work Employee

performs." (Id. ¶ 19.)  In addition to the Employment Agreement, Cola also signed a detailed

Employee Handbook, which noted that Plaintiffs' employees were charged with retaining the

confidentiality of much of the information they received in the course of their employment.  (Id. ¶¶

21-22.)

The day after signing the Employment Agreement, Cola consulted his attorney and learned

the full extent of the restrictive covenant.  (Cola Aff. ¶ 14.)  Following his conversations with

counsel, Cola believed that he had been given no consideration to support the new Employment

Agreement.  (Id. ¶ 18.)[1]  Cola thereafter recorded the circumstances surrounding his execution of the

Brown-PA Employment Agreement in a memorandum to file.  (Id. ¶ 15; Def. Cola's Mot. Summ. J.

Ex. E.)

### 2.     Cola's Employment with Plaintiffs

Cola began his employment with Brown-PA in February 2004, as a producer.  (Compl. ¶ 66;

Cola Answer ¶ 66.)  Immediately after the acquisition, he continued to report to Frank Doyle – who

was the Profit Center Leader of Brown-PA – to operate out of the same office, and to work with the

same staff.  (Cola Aff. ¶ 16.)  Cola and the others at Brown-PA also still operated under the name

"Doyle Consulting Group" until efforts were made in 2006 and 2007 to strictly use the "Brown &

Brown Consulting" name.  (Id. ¶ 17.)  His job description and daily responsibilities did not change.

(Id. ¶ 18.)  Additionally, he was told that his compensation at Brown-PA would be the same as at

---

[1]  Defendant Cola cites to the deposition Ed Chorzelewski, who was a former DCG employee
and is currently Plaintiff's corporate designee, to bolster the propositions that the Employment
Agreement was offered on a take-it-or-leave it basis with no additional consideration.  Upon
reference to the portions of the deposition cited by Defendant Cola, however, the Court notes that
Mr. Chorzelewski was speaking to his personal experience in signing the Employment
Agreement, not to Mr. Cola's.  (See generally Chorzelewski Dep.)  Federal Rule of Evidence 602
makes clear that "[a] witness may not testify to a matter unless evidence is introduced sufficient
to support a finding that the witness has personal knowledge of the matter."  Fed. R. Evid. 602.

DCG, which was structured through an annual salary plus a bonus based on profits. (Id. ¶ 19.) He understood that, pursuant to section five of the Cola Employment Agreement, if there were to be future changes to his compensation, he would be informed in advance and given an opportunity to negotiate changes. (Id. ¶ 19.)

By February 2006, Cola held the highest executive position at Brown-PA as a "Profit Center Leader," responsible for the overall operation of the office, its employees, and its customers. (Compl. ¶ 66; Cola Answer ¶ 66; Chorzelewski Aff. ¶ 10.) During the course of his job performance, Cola acquired and developed trade secrets and confidential and proprietary information with regard to the business of Brown & Brown and Brown-PA. (Chorzelewski Aff. ¶ 10.) Cola had access to all of his employer's documents and information, including materials related to customers, policies, and renewal dates. (Id. ¶ 11.)

As his compensation was heavily reliant upon bonuses, Cola resolved to grow Brown-PA and, in 2005, his office was the Retail Office of the Year. (Cola Aff. ¶ 21.) From the years 2004 through 2009, Cola's compensation, including bonuses, went from $184,036 to $566,953. (Id. ¶ 21.) Nonetheless, he became increasingly dissatisfied at Brown-PA. (Id. ¶ 22.) According to Cola, his supervisor, Thomas Riley – who was the Regional President for Brown & Brown – repeatedly engaged in unprofessional conduct towards him in front of his employees and other Employee Benefits professionals. (Id. ¶ 23.) Numerous potential clients also expressed their unwillingness to do business with Brown-PA due to Riley's inappropriate behavior and comments. (Id.) In June 2007, Cola documented an incident wherein Riley became intoxicated during an industry conference and loudly embarrassed Cola in front of other employees. (Def. Cola's Mot. Summ. J., Ex. H.) In light of his growing concerns, Cola began speaking with other firms about leaving Brown-PA. (Cola Aff. ¶ 26.) As a result of the restrictions in his Employment Agreement, however, he had problems

making a deal with any of the prospects.  (Id.)

On December 1, 2009, Cola learned from Brown-PA.'s accounting manager, Dean Saperstein, that Brown & Brown had decided to separate Brown-PA's wholesale operations from its retail (or consulting) operations, effective January 1, 2010.  (Cola Aff. ¶ 27.)  Cola was greatly concerned because this split would undermine the retail group's success and financial viability, jeopardize the quality of service provided to the retail customers, and serve to significantly decrease Cola's bonus entitlement and total compensation.  (Id. ¶ 28.)  Cola raised his concerns about the separation with both Riley and Powell Brown, Brown & Brown's CEO.  (Id. ¶¶ 29-32.)  He explained that he had serious concerns that the retail branch would not be able to produce an Operating Profit of 28% – which is what Brown & Brown demanded – on its own.  (Id. ¶ 35.)  Riley responded that if the retail branch was running at a profit margin of less than 28%, he could move some expenses over to the wholesale brokerage profit center so that retail's profit margin would be over 28%.  (Id. ¶ 37.)  Cola believed this to be a violation of the Sarbanes Oxley Act and wanted no part of it.  (Id.)  In light of the impact on his bonuses, Cola also believed this to be in contravention of his Employment Agreement.  (Id. ¶ 40.)  He again documented his concerns in a memo to file dated December 2, 2009.  (Def. Cola's Mot. Summ. J., Ex. G.)

Shortly after learning of the split of the wholesale and retail branches, Cola became privy to a highly confidential potential merger of Brown & Brown with an equally prominent firm.  (Cola Aff. ¶ 43.)  Cola was concerned that if the merger went through, the Brown-PA staff would be reduced, compromising his ability to deliver services to his clients.  (Id. ¶ 43.)  Based on his growing dissatisfaction and his concern about the company's future, Cola resigned from Brown-PA on June 11, 2010.  (Id. ¶ 46.)

### 3. Cola's Alleged Wrongful Conduct

According to the Complaint, Frank Doyle formed a new insurance brokerage firm, in March 2010, named Doyle Alliance Group ("Doyle Alliance"), and allegedly began operations to compete with Brown & Brown in the insurance agency, brokerage, and consulting business. (Compl. ¶ 84.) Doyle purportedly recruited and offered employment to Cola and encouraged him to solicit and take Plaintiffs' customers and use Plaintiffs' confidential business information. (Id. ¶ 87.)

Plaintiffs allege, upon information and belief, that immediately after his resignation, Cola began to work as an insurance broker and consultant for Doyle Alliance. (Id. ¶ 91.) Plaintiffs also contend that while Cola was still employed by Brown & Brown, he was actively engaged in building a competitive business by meeting with Doyle, setting up an office, soliciting Brown & Brown's customers, and using Brown & Brown's proprietary information. (Id. ¶¶ 92-95.) As evidence of this conduct, Plaintiffs note that in April 2010, while still employed as Profit Center Leader of Brown-PA, Cola reviewed at least one solicitation letter on behalf of Doyle Alliance Group, targeting a then-current Brown-PA customer, Sayreville Board of Education. This letter was then forwarded to Doyle Alliance Group's lawyers, signed by Frank Doyle, and sent to the Sayreville Board of Education. (Pls.' Resp. Def. Cola's Mot. Summ. J., Ex. E, Dep. of Robert Cola, 133:22-140:18, Jan. 21, 2011 ("Cola Dep.").))[2] Also, shortly before he resigned, Cola admitted to having conversations with Brown-PA employee Jana Jim about becoming an employee at Doyle Alliance Group. (Id. at 185:13-186:13, 197:2-190:22.) Cola further conceded having discussions with Al Danish, another Brown-PA employee, about joining Doyle Alliance Group. (Id. at 193:6-200:8.) Finally, Cola indicated that, in the first six months of 2010, while still employed with Brown-PA, he was involved

---

[2] Plaintiffs allege, without evidentiary support, that Cola ghost wrote this letter. In his deposition, however, Cola indicated that either Frank Doyle or Ryan Tola drafted the letter. (Id. at 136:23-137:3.)

in helping to set up and organize the business that became the Doyle Alliance Group, including logistics involving office space, IT vendors, computers, fax machines, copiers, etc. (Id. at 111:7-21.)

**C.      Facts Relevant to Defendant Ryan Tola**

**1.      Plaintiffs' Hiring of Ryan Tola**

Defendant Ryan Tola, a resident of New Jersey, is a licensed insurance broker and has worked in the insurance consulting and brokerage business since March 2000. (Def. Tola's Mot. Summ. J., Ex. A, Aff. of Ryan Tola, ¶¶ 3-4, Dec. 20, 2010 ("Tola Aff.").) On March 28, 2000, he became an employee of DCG, where he worked through February of 2004. (Id. ¶ 7.) While employed by DCG, he learned about all aspects of analyzing employee benefit programs, marketing the services of DCG, and serving clients in connection with employee benefit programs. (Id. ¶ 8-9.) In addition, he established relationships with clients, most of whom were New Jersey school districts, and continued to service and sell to those clients after DCG was later acquired by Brown & Brown. (Id. ¶ 10.) All of his work at DCG was in the area of insurance for employee benefit programs, and more than 80% of the customers he serviced while at DCG were public sector clients, including New Jersey school districts and municipalities. (Id. ¶ 11.)

In early 2004, Tola learned that DCG was being sold to Brown & Brown. (Id. ¶ 12.) Some time in late January 2004, he was provided an employment agreement with Brown-PA and was asked to sign the agreement by the end of the day if he wanted to be employed by the Brown & Brown organization. (Id. ¶ 14.) Although he requested to have it reviewed by an attorney prior to signing, no time was permitted for such a review. (Id. ¶ 15.) He signed the employment agreement and began working at Brown-PA. (Id.) Thereafter, between February 2004 and early 2007, Tola remained employed at Brown-PA, where he serviced the clients he had worked with at DCG. (Id. ¶ 16.)

In late 2006 or early 2007, Thomas Riley advised Tola that Brown & Brown was in the process of acquiring Grinspec, Inc., a New Jersey brokerage firm that was a family-owned business doing only New Jersey public sector work. (Id. ¶¶ 17-18.) Riley explained that Grinspec's principals would not be acquired and that he wanted Tola to manage the Grinspec subsidiary. (Id. ¶¶ 19-20.) In connection with Tola's move to Grinspec, Riley, Tola, and Cola discussed Tola's transition, the terms of which were purportedly memorialized in a February 23, 2007 e-mail sent from Cola to both Tola and Riley. (Tola Aff. ¶ 21; Def. Tola's Mot. Summ. J., Ex. 1.) The e-mail stated as follows:

> To recap the meeting that we had here on Wednesday regarding Ryan's transition to Grinspec, here is what we discussed:
>
> •    Ryan's book of business will remain here, will be serviced here, and Ryan will remain involved in key accounts by maintaining key relationships.
> •    We will compensate his office for his involvement in those accounts
> •    Ryan's Comp:
>     ☐    Ryan's base will be between $250,000 and $275,000
>     ☐    $70,000 will be added to his compensation, which will be paid by the compensation we pay to his office for his involvement.
>     ☐    Bonus Full 8% of Net operating income (66.7% of overall available PCL Bonus), effective this year.
>     ☐    PSP: Approximately $100,000
>     ☐    Moving Allowance: $25,000

(Id.) In reliance on such promises, Tola accepted the employment and began work as Grinspec's manager in April of 2007. (Tola Aff. ¶ 22.) At no time prior to his beginning employment with Grinspec was he advised that he would be required to sign a new employment agreement. (Id.)

After Tola had been employed by Grinspec for many months, Brown & Brown management and Grinspec asked Tola to execute an employment agreement dated "as of April 2, 2007" ("Tola Employment Agreement"). (Tola Aff. ¶ 23; Def. Tola's Mot Summ. J., Ex. 2.) Like the Cola Employment Agreement, the Tola Employment Agreement contained a non-solicitation of customers provision prohibiting him from directly or indirectly soliciting or inducing any existing or

prospective customers of Brown & Brown and Brown-PA, or any of their affiliates, both during his

employment with Brown-PA and for twenty-four months after the termination of his employment.

(Pls.' Resp. Def. Tola's Mot. Summ. J., Ex. B, Aff. of Thomas Riley, ¶ 15 August 16, 2010 ("Riley

Aff.").)  In addition, Tola expressly agreed not to use or disclose any confidential proprietary

information of Brown & Brown or its affiliates both during or after his employment with Grinspec.

(Id. ¶ 17.)  Tola further contracted that, both during his employment with Grinspec and for two years

after the cessation of such employment, he would not, directly or indirectly, solicit employees of

Grinspec or Brown & Brown to work for a competitor.  (Id. ¶ 18.)  Finally, Tola agreed that, during

his employment with Grinspec, he would "not undertake the active planning or organizing of any

business activity competitive with the work Employee performs."  (Id. ¶ 19.)  Tola also signed the

same Employee Handbook as Cola.  (Id. ¶¶ 21-22.)

## 2.    Tola's Employment with Plaintiffs

Tola remained the Profit Center Leader of Grinspec from April 2007 until his voluntary

resignation in June 2010.  (Chorzelewski Aff. ¶¶ 2-3.)  As Profit Center Leader, he was responsible

for the overall operation of the office, its employees and its customers, and had complete access to

Grinspec's information and files concerning all of Grinspec's customers and potential customers.

(Id. ¶ 4.)  Because he continued to work with Brown-PA customers even after transferring to

Grinspec, Tola had access to all of Brown-PA's documents and information, including proprietary

information.  (Id. ¶ 7.)

Tola alleges that, notwithstanding the promises purportedly made to him by Riley in February

of 2007, Grinspec and Brown & Brown, at the direction of Riley, refused to pay wages and other

benefits owed to Tola in excess of $190,000, despite his repeated demands starting in September

2007.  (Tola Aff. ¶ 24.)  Moreover, throughout his employment with Grinspec, Riley allegedly

engaged in repeated unprofessional conduct, undermined Tola's credibility, interfered with the effective operation of Grinspec, and made promises to both Tola and the producing brokers of Grinspec that he failed to keep. (Id. ¶ 25-26.) On June 15, 2010, Tola resigned from Grinspec and began employment with Doyle Alliance Group. (Id. ¶ 27.)

### 3. Tola's Alleged Wrongful Conduct

Plaintiffs allege that while Tola was still employed by Grinspec, he was actively engaged in building Doyle Alliance and took property and materials of Plaintiffs, including documents containing confidential and proprietary information, to use on behalf of Doyle Alliance. (Pls.' Resp. Def. Tola's Mot. Summ. J. 15.) Further, they claim that Tola has, in breach of his Employment Agreement, solicited and intends to solicit Plaintiffs' customers to cease being customers of Plaintiffs. (Id.)

### D. Procedural Background

On August 4, 2010, Plaintiffs commenced the present lawsuit against Cola, Tola, and Doyle Alliance Group, setting forth fifteen Counts as follows: (1) unfair competition under the Lanham Act, 15 U.S.C. § 1125, due to Defendants' use of the name "Doyle Alliance Group" and the internet domain "doylealliancegroup.com" (Compl. ¶¶ 109-18); (2) trademark infringement under the Lanham Act resulting from Defendants' use of the internet domain name "doylealliancegroup.com" (id. ¶¶ 119-24); (3) a state law claim of unfair competition, again caused by Defendants' use of the name "Doyle Alliance Group" (id. ¶¶ 125-33); (4) breach of contract against solely Cola and Tola, due to their alleged violation of their respective Employment Agreements (id. ¶¶ 134-40); (5) breach of fiduciary duty and/or duty of loyalty against Defendants Cola and Tola (id. ¶¶ 141-46); (6) tortious interference with existing contractual relations against Doyle Alliance for interfering with Cola and Tola's Employment Agreements (id. ¶¶ 148-56); (7) another tortious interference claim against all

Defendants for interference with Plaintiffs' contractual and business relationships with customers (id. ¶¶ 157-63); (8) a tortious interference claim against all Defendants for interference with Brown & Brown's contractual relations with its employees (id. ¶¶ 164-71); (9-11) misappropriation of business, misappropriation of confidential and proprietary information, and misappropriation of property against all Defendants (id. ¶¶ 172-90); (12-15) unfair competition, civil conspiracy, conversion, and unjust enrichment against all Defendants. (Id. ¶¶ 188-211.)

On September 7, 2010, Defendant Ryan Tola filed a Motion to Dismiss the Complaint in its entirety under Federal Rule of Civil Procedure 12(b)(2). On the same date, all Defendants joined in a Motion to Dismiss Plaintiffs' Complaint under Rule 12(b)(6) for failure to state a claim upon which relief may be granted. By way of Memorandum and Order dated October 4, 2010, the Court granted Defendants' Motion for dismissal of the fiduciary duty/duty of loyalty claim, the tortious interference claims as to Defendants Tola and Cola, the conversion claim as to Tola and Cola only to the extent the claim alleged conversion of customers and business, and the misappropriation of business/customers claim as to Tola and Cola. The Motions were denied in all other respects.

All Defendants filed Answers on October 22, 2010, and Defendants Tola and Cola filed Counterclaims. Tola alleged the following causes of action: (1) a declaratory judgment that the restrictive covenant in Tola's employment agreement with Grinspec is not enforceable (Tola Countercl. ¶¶ 258-68); (2) interference with prospective advantageous relations (id. ¶¶ 269-74); (3) interference with contractual relations (id. ¶¶ 275-80); (4) unfair competition (id. ¶¶ 281-90); (5) breach of contract against only Defendant Grinspec (id. ¶¶ 291-97); and (5) violation of New Jersey Wage Payment Law against only Defendant Grinspec. (Id. ¶¶ 298-302.) Cola's Counterclaim alleged: (1) declaratory judgment that the restrictive covenant in his employment agreement with Brown-PA is unenforceable (Cola Countercl. ¶¶ 1-10), and (2) unfair competition. (Id. ¶¶ 11-20.)

13

Plaintiffs sought dismissal of the Counterclaims and, in December 2010, the Court denied Plaintiffs' Motion in its entirety.

On December 12, 2010 and January 18, 2011, Defendants Tola and Cola filed their respective Motions for Summary Judgment. Upon Stipulation by the parties, the Court, by way of Order dated January 19, 2011, continued the preliminary injunction hearing and stayed consideration of the pending motions while the parties pursued private mediation. On March 8, 2011, the parties informed the Court that private mediation had been unsuccessful. Both motions are now ripe for the Court's consideration.

## II.     STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)). Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United

States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586. "[T]he non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Moreover, the mere existence of some evidence in support of the nonmovant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmovant on that issue. Anderson, 477 U.S. at 249-50.

## III.    DISCUSSION

Defendants Cola and Tola raise a host of issues in support of summary judgment, some of which overlap and some of which are entirely unique to their respective cases. The Court first addresses Defendants' joint allegation that Plaintiffs' Lanham Act claim must fail, thereby eliminating the sole basis for federal subject matter jurisdiction. Second, the Court turns to

Plaintiffs' Rule 56(d) request that the Court forego further consideration of the summary judgment motions pending additional discovery in this case.

### A. Lanham Act Claim

Defendants' primary argument asserts that the Court should decline to exercise subject matter jurisdiction because Plaintiffs cannot prove the viability of their Lanham Act claim – the lone federal cause of action. Defendants explain that even if Plaintiffs own a valid and legally protectable mark, they cannot, as a matter of law, prove continued use of the mark in commerce. Because the Lanham Act claim fails as a matter of law, Defendants contend that the Court should decline to exercise supplemental jurisdiction over the remaining state law claims.[3]

Counts I and II of Plaintiffs' Complaint allege Lanham Act violations in the form of unfair competition under section 43(a), 15 U.S.C. § 1125,[4] and trademark infringement under section 32,

---

[3] Defendants characterize this argument as one involving the subject matter jurisdiction of the Court, requiring resolution before any consideration of the pending motion for a preliminary injunction. The United States Supreme Court, however, has made clear that "[a] district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." Carlsbad Tech., Inc. v. HIF Bio, Inc., 129 S. Ct. 1862, 1866-67 (2009) (citing 28 U.S.C. § 1367(c) ("The district courts *may* decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." (emphasis added)); Osborn v. Haley, 549 U.S. 225, 245 (2007) ("Even if only state-law claims remained after resolution of the federal question, the District Court would have discretion, consistent with Article III, to retain jurisdiction."); Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) ("[W]hen a court grants a motion to dismiss for failure to state a federal claim, the court generally retains discretion to exercise supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over pendent state-law claims"); 13D C. WRIGHT, A. MILLER, E. COOPER, & R. FREER, FEDERAL PRACTICE AND PROCEDURE § 3567.3, pp. 428-32 (3d ed. 2008) ("Once it has dismissed the claims that invoked original bases of subject matter jurisdiction, all that remains before the federal court are state-law claims . . . . The district court retains discretion to exercise supplemental jurisdiction [over them].")). Thus, the district court's exercise of its discretion under § 1367(c) is clearly not a jurisdictional matter. Carsbad Tech., 129 S. Ct. at 1867.

[4] Section 43(a) of the Lanham Act, which governs federal unfair competition claims, provides in part:

15 U.S.C. § 1114.[5]  The tests for trademark infringement and unfair competition under the Lanham

Act are essentially the same.  A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198,

210 (3d Cir. 2000).  Thus, to prevail on either claim, a plaintiff must demonstrate that:  (1) it has a

---

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which–

> **(A)** is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . .

. . .

> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C.A. § 1125.

[5]  Section 32 of the Lanham Act provides:
Any person who shall, without the consent of the registrant–

> **(a)** use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
>
> **(b)** reproduce, counterfeit, copy, or colorably imitate a registered mark and
>
> apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

> shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

15 U.S.C.A. § 1114(1).

valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark causes a likelihood of confusion. Id. Moreover, to establish a trademark infringement claim, the plaintiff bears the additional burden of showing that the defendant's use of the offensive mark is unauthorized. Piquante Brands Int'l, Ltd. v. Chloe Foods Corp., No. CIV.A.08-4248, 2009 WL 1687484, at *3 (D.N.J. June 16, 2009). To prevail in cases where a mark is unregistered, a plaintiff must also show "(1) that he was the first to adopt the mark in commerce; (2) he has continuously used the mark in commerce since its adoption; and (3) his mark is inherently distinctive or has acquired secondary meaning." Douglas v. Osteen, 317 Fed. Appx. 97, 99 (3d Cir. 2009); see also Ford Motor Co. v. Summit Motor Prods., Inc., 930 F.2d 277, 292 (3d Cir. 1991).

Without foregoing their position that none of the above elements have been met, Defendants' Motions for Summary Judgment seize only on the element of continuous use. Defendants explain that, "[P]laintiffs embarked upon a deliberate and strategic marketing plan to abandon the 'Doyle' and 'Doyle Consulting' name so that the consumer of its services would no longer identify 'Doyle' or 'Doyle Consulting' as the source of its services."[6] (Def. Tola's Mem. Supp. Mot. Summ. J. 10.) Plaintiffs respond that their use of the "Doyle" name is active and ongoing.

The Lanham Act defines the term "use in commerce" as follows:

the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce--

(1) on goods when--

(A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated

---

[6] Defendants state that although they have additional grounds for ultimately seeking summary judgment on the trademark claim, those grounds are not ripe for summary judgment on the present record. These issues are preserved for later consideration by the Court, if necessary.

with the goods or their sale, and

> (B) the goods are sold or transported in commerce, and

(2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

15 U.S.C. § 1127. The Act goes on to indicate that a mark shall be deemed "abandoned" if either of the following occurs:

(1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

(2) When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark. Purchaser motivation shall not be a test for determining abandonment under this paragraph.

15 U.S.C. § 1127.

The Act provides two alternative methods for showing abandonment. First, "abandonment may be established by the owner's (1) non-use of the mark combined with (2) an intent to abandon." Birthright v. Birthright, Inc., 827 F. Supp. 1114, 1139 (D.N.J. 1993) (citing 15 U.S.C. § 1127; United States Jaycees v. Philadelphia Jaycees, 639 F.2d 134, 138 (3d Cir. 1981); BIEC Int'l, Inc. v. Global Steel Serv., Ltd., 791 F. Supp. 489, 533 (E.D. Pa. 1992)); see also Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc., 304 F.3d 1167, 1174 (11th Cir. 2002). Second, "abandonment may also occur as a result of 'any acts of commission or omission causing the marks at issue to lose their significance as indications of origin.'" Birthright, 827 F. Supp. at 1139 (quoting U.S. Jaycees, 639 F.2d at 139)). Because Defendants focus only on the first method, the Court likewise restricts its analysis.

As a threshold matter under the first method, "abandonment requires *complete* cessation or discontinuance of trademark use." Electro Source, LLC v. Brandess-Kalt-Aetna Group, Inc., 458 F.3d 931, 938 (9th Cir. 2006) (emphasis in original); see also Doeblers Pa. Hybrids, Inc. v. Doebler, 442 F.3d 812, 823 (3d Cir. 2006) (declining to find abandonment where "[t]he simple fact [was] that the use of [the trademark] never ceased"). Thus, "[e]ven a single instance of use is sufficient against a claim of abandonment of a mark if such use is made in good faith." Carter-Wallace v. Proctor & Gamble, 434 F.2d 794, 804 (9th Cir. 1970); see also Kardex Sys, Inc. v. Sistemco N.V., 583 F. Supp. 803, 813 (D. Me. 1984). "To prove bona fide usage, the proponent of the trademark must demonstrate that use of the mark has been deliberate and continuous, not sporadic, casual or transitory." Warren Publ'g Co. v. Spurlock, 645 F. Supp. 2d 402, 434 (E.D. Pa. 2009) (quoting La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc., 495 F.2d 1265, 1271-72 (2d Cir. 1974)).

In addition, "to establish the defense of abandonment it is necessary to show not only acts indicating a practical abandonment, but [also] an actual intent to abandon." Marshak v. Treadwell, 240 F.3d 184, 198 (3d Cir. 2001) (quoting Saxlehner v. Eisner & Mendelson Co., 179 U.S. 19, 31 (2001). More precisely, "[a]bandonment under § 1127 requires an intent not to resume trademark use, as opposed to a prospective intent to abandon the mark in the future." Electro Source, 458 F.3d at 937. Consequently, "a prospective declaration of intent to cease use in the future, made during a period of legitimate trademark use, does not meet the intent not to resume standard." Id. at 937.

Notably, abandonment of a trademark, "being in the nature of a forfeiture, must be strictly proved." Marshak, 240 F.3d at 198 (quoting U.S. Jaycees, 639 F.2d at 139). The burden of proof is on the party claiming abandonment. Id.; see also Exxon Corp. v. Humble Exploration Co., Inc., 695 F.2d 96, 99 (5th Cir. 1982). Nonuse for three consecutive years shall be prima facie evidence of

abandonment. 15 U.S.C. § 1127. This creates a "rebuttable presumption of intent not to resume use." Cumulus Media, Inc., 304 F.3d at 1174. At that point, "[t]he burden of production, although not the ultimate burden of persuasion, shifts to [the plaintiff] 'to produce evidence that [it] either used the mark during the statutory period or intended to resume use.'" Natural Answers, Inc. v. SmithKline Beecham Corp., 529 F.3d 1325, 1330 (11th Cir. 2008) (quoting Cumulus Media, 304 F.3d at 1177). As a basic rule, "[a]bandonment is generally a factual issue." Electro Source, 458 F.3d at 937. Thus, "[w]hile intent not to resume 'may be inferred from circumstances,' . . . summary judgment is 'notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles.'" Cline v. 1-888-PLUMBING Group, Inc., 146 F. Supp. 2d 351, 364 (S.D.N.Y. 2001) (quoting Leberman v. John Blair & Co., 880 F.2d 1555, 1560 (2d Cir. 1989)).

In the present case, the parties agree, for purposes of this Motion only, that Plaintiffs purchased the assets of Doyle Consulting in February 2004, including the "Doyle" name and trademark. Following the acquisition, the former employees of DCG working for Brown-PA continued to work from the same offices and initially did business under the name "Doyle Consulting Group" to allow for a smooth transition of accounts. (Def. Tola's Mot. Summ. J., Ex. B, Second Aff. of Robert Cola, ¶¶ 4-5, 13, Dec. 20, 2010 ("Sec. Cola Aff.").) Defendants, however, contend that Plaintiffs discontinued use of the name "Doyle" or "Doyle Consulting" in commerce with no intent to resume such use. Specifically, Defendants claim that "plaintiffs embarked upon a deliberate and strategic marketing plan to abandon 'Doyle' and 'Doyle Consulting' as the source of its services." (Def. Tola's Mem. Supp. Mot. Summ. J. 10.) In mid-2006, Riley determined that the transition had been successful and decided that changes should be made to completely integrate what was formerly known as Doyle Consulting Group into the Brown & Brown organization. (Sec. Cola

Aff. ¶¶ 14-15.)  As of February 2006, Frank Doyle was removed as Profit Center Leader of Brown-PA and Riley instructed Cola to hire an outside public relations firm to implement the new branding plans.  (Id. ¶¶ 17-18.)  The outside firm constructed a two-phase transition.  (Id. ¶¶ 18-19.)  Phase one involved elimination of the "Doyle Consulting Group" name from all advertising, correspondence, business cards, and other communications, and substituted with the name "Brown & Brown Consulting," followed by the tag line "formerly Doyle Consulting Group."  (Id. ¶ 20.)  The second phase would involve elimination of the "formerly Doyle Consulting Group" tagline altogether.  (Id. ¶ 21.)  In January of 2007, this new name, logo, and strategy was announced to the staff of Brown-PA and, shortly after that meeting, all signage with the name "Doyle Consulting Group" was removed from the office.  (Id. ¶ 23.)  At that meeting, Cola also told the Brown-PA staff that every time anyone used the "Doyle Consulting Group" going forward, they would have to place a dollar in a fishbowl, the proceeds from which would be used for entertainment of the Brown-PA staff.  (Id. ¶ 24.)

Around the same time, the Doyle Consulting Group website was taken down and replaced with a Brown & Brown Consulting website, with a url of "consultbb.com."  (Id. ¶ 25.)  To ensure the effectiveness of this transition, Cola made arrangements so that if the url "doyleconsulting group.com" was entered into a web browser, the user would automatically directed to the Brown & Brown Consulting website, which contained no reference to "Doyle Consulting Group."  (Id. ¶ 26.)  In connection with these actions, Brown-PA made arrangements to have e-mail addressed to Brown-PA Employees at "doyleconsultinggroup.com," "bbinspa.com," and "dcgbenefits.com" to be automatically forwarded to the appropriate new e-mail addresses of "consultbb.com" (Id. ¶ 28.)  E-mails contained no reference to "Doyle Consulting Group."  (Id. ¶ 29.)  Based on this factual background, Tola now concludes that "there is *no* evidence that 'Doyle' or 'Doyle Consulting' have

been used in commerce since late 2006." (Def. Tola's Mem. Supp. Mot. Summ. J. 11.)

In response, Plaintiffs contend that "since the purchase of assets of Doyle Consulting in February 2004, including the purchase of the 'Doyle' name and trademark, Brown-PA has continued to use, and has not abandoned, the 'Doyle' name and trademark in commerce as part of the presentation, promotion and advertising of Brown-PA's services." (Pls.' Resp. Tola Mot. Summ. J. 23.) To support this allegation, Plaintiffs cite the following evidence:

- Continuous and active use of e-mail addresses of Brown-PA employees with the tag line "@doyleconsultinggroup.com" and "@dcgbenefits.com." (Chorzelewski Aff. ¶ 20; Pls.' Resp. Def. Tola Mot. Summ. J., Ex. F, Attachment B.)

- Customers and others to whom communications are directed associate the name "Doyle" and its derivatives with Brown & Brown and Brown-PA. (Chorzelewski Aff. ¶ 19.) This is reflected in an e-mail sent, on May 4, 2010, to Robert Cola at his address "rcola@doyleconsultinggroup.com." (Pls.' Resp. Def. Tola Mot. Summ. J., Ex. G.)

- Brown-PA uses the internet domain name "http://doyleconsultinggroup.com/" to direct internet users to its web site to advertise Brown-PA's insurance services. (Chorzelewski Aff. ¶ 22.)

- Grinspec has a sales display that has been used numerous times at various conventions, and that identifies "Brown & Brown Consulting" as "Formerly Doyle Consulting Group." (Pls.' Resp. Def. Tola's Mot. Summ. J., Aff. of Louis E. Della Penna, Jr., ¶¶ 2-4, Jan. 10, 2011 ("Della Penna Aff.").)

- The current Profit Center Leader of Brown-PA has used, as recently as 2010, an e-mail signature block that was automatically inserted into all of his e-mail outgoing to third parties, including customers, which identified him as Profit Center Leader of "Brown & Brown Consulting/Formerly Doyle Consulting Group." (Chorzelewski Aff. ¶¶ 20-23, Pls.' Resp. Def. Tola's Mot. Summ. J. Ex. H.)

- A February 2009 document labeled "Insurance Broker Services – Health Benefits" that was directed to Sayreville Public Schools states, on the front page, that the document is being presented by "Brown & Brown Consulting/Formerly Doyle Consulting Group." (Pls.' Resp. Def. Tola's Mot. Summ. J., Ex. I.)

- Correspondence dated between December 13, 2007 and September 9, 2008, with respect to Grinspec client South River Board of Education, are contained on letterhead stating, "Brown & Brown Consulting/Formerly Doyle Consulting Group." (Id. Ex. J.)

Although Plaintiffs do not deny that they have been making efforts to phase out use and prominence of the "Doyle" trademark as compared to the "Brown & Brown" trademark, they argue that they still rely on the good will and value of the "Doyle" name and that clients and prospective clients of Plaintiffs still associate the "Doyle" name with "Brown & Brown." Plaintiffs again cite to numerous pieces of evidence to establish this continued association:

- The Bloomberg Businessweek web page, on January 10, 2011, listed Doyle Consulting Group, Inc. as an insurance brokerage firm that operates "as a subsidiary of Brown & Brown of Pennsylvania, Inc." The listed address is that of Brown-PA. (Pls.' Resp. Def. Tola's Mot. Summ. J., Ex. P.)

- A producer at Brown-PA received a communication from Prudential, dated December 16, 2010, that listed him as being part of Doyle Consulting Group. (Id., Ex. K.)

- A recent invoice from LexisNexis was sent to Brown-PA's address, but was listed under the name of Doyle Consulting Group. (Id. Ex. L.)[7]

Via his Reply Brief, Defendant Tola attempts to rebut much of this evidence by attaching the deposition of Ed Chorzelewski, Plaintiff Brown-PA's corporate designee, and Lou Della Penna, Jr., Plaintiff Grinspec's corporate designee, which were taken subsequent to the filing of the original Summary Judgment Motion. In Mr. Chorzelewski's deposition, he admits to no continued use of the internet domain name "@doyconsultinggroup.com" or "@dcgbenefits.com," and that no continuing use of the name existed when Plaintiffs filed their Complaint in this action. (Def. Tola's Reply Br., Dep. of Ed Chorzelewski, 84:9-86:9, Jan. 10, 2011 ("Chorzelewski Dep.").) Moreover, Chorzelewski conceded that in late 2006 and early 2007, a decision was made to transition from use

---

[7] Plaintiff offers several other examples, none of which the Court finds either probative or necessary to a decision on this issue.

of the Doyle Consulting name in favor of the Brown & Brown Consulting name and has taken

various steps to effect that transition.[8]  (Id. 65:1-69:24, 77:1-78:24, 80:13-86:24.)  Finally, Tola

argues that, according to Chorzelewski's deposition, any use by him of the tag line "formerly known

as Doyle Consulting Group" were inadvertent and infrequent, and that the other sixty employees of

Brown-PA had abandoned all use of the tag line.  (Id.)  Defendants contend that any accidental use

of the name "Doyle Consulting" or "mapping"[9] cannot be viewed as "active use" of the "Doyle"

mark.

     Such a record of conflicting affidavits, testimony, and documents exposes an obvious and

genuine issue of material fact as to whether Plaintiffs have abandoned the use of the "Doyle" or

"Doyle Consulting" marks.  The Third Circuit is clear that abandonment must be "strictly proved,"

making it particularly unsuitable for resolution on summary judgment.  U.S. Jaycees, 639 F.2d at

139.  Some of the existing evidence, taken in the light most favorable to Plaintiffs, suggests that

several employees and documents still use the tag line, "formerly known as Doyle Consulting

Group" to maintain marketing continuity.  (Chorzelewski Dep. 67:4-7.)  Moreover, to date, entry of

"doyleconsultinggroup.com" into an internet browser will direct the user to Brown & Brown's

website.  Whether such usage constitutes the requisite "bona fide" usage made "in the ordinary

course of trade" is simply not determinable from the few depositions and affidavits presented to the

Court.  Moreover, although the evidence suggests that Plaintiffs are in the continuing process of

transitioning away from their use of the mark and may eventually abandon the "Doyle" name, it is

---

[8]  The Court notes that Defendant Tola's characterization of Mr. Chorzelewski's deposition (i.e., stating that a decision was made to "abandon" the Doyle Consulting name, and Brown & Brown employees were advised that they would be "fined" if they used the "Doyle" or "Doyle Consulting" name), amounts to some degree of exaggeration and overstating of the actual testimony.

[9]  "Mapping" occurs where an e-mail mistakenly sent to an inactive Doyle Consulting address would be forwarded to the new Brown & Brown address.

well-settled that "a prospective declaration of intent to cease use in the future, made during a period of legitimate trademark use, does not meet the intent not to resume standard." Electro Source, 458 F.3d at 937. Plaintiffs have alleged evidence that they still rely on the familiarity and goodwill associated with the "Doyle" name in order to transact business. Drawing all reasonable inferences in favor of Plaintiffs – as is required under Federal Rule of Civil Procedure 56 – the Court must deny summary judgment on this ground.

**B.   Rule 56(d) Motion**

Defendants next raise a series of challenges to the enforceability of their respective Employment Agreements and restrictive covenants. Plaintiffs respond that the Motions for Summary Judgment are premature because, at this early stage of the litigation, they have not yet had the opportunity to discover information essential to their opposition. As such, Plaintiffs move to have the summary judgment motions denied without prejudice.

The United States Supreme Court has noted that summary judgment may be denied if the motion is premature. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 n.5 (1986). Federal Rule of Civil Procedure 56(d) states:

> **When Facts are Unavailable to the Nonmovant**. If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
> (1) defer considering the motion or deny it;
> (2) allow time to obtain affidavits or declarations or to take discovery; or
> (3) issue any other appropriate order.

FED. R. CIV. P. 56(d). Because a plaintiff should not be "'railroaded' by a premature motion for summary judgment," the Supreme Court has held that a district court must apply Federal Rule of Civil Procedure 56(d)[10] if the opposing party has not made full discovery. Celotex Corp. v. Catrett,

---

[10]  Prior to December 1, 2010, the substance of Rule 56(d) was encompassed in Rule 56(f). As indicated by the Advisory Committee Notes to the 2010 amendments, however, "Subdivision (d)

477 U.S. 317, 326 (1986). Nonetheless, the district court retains the authority to decide whether a motion is ripe for consideration and determine whether or not to delay action on a motion for summary judgment. St. Surin v. Virgin Islands Daily News, 21 F.3d 1309, 1313 (3d Cir. 1994).

Pursuant to Rule 56(d), an opposing party must file an affidavit fully outlining the reasons for the opposition. Id. at 1313. The Rule 56(d) affidavit must "identify with specificity what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained." Id. The Third Circuit has emphasized the importance of a party's full compliance with the affidavit requirement. Id. at 1314; Koenhke v. City of McKeesport, 350 Fed. Appx. 720, 723 (3d Cir. 2009), cert. denied, 130 S. Ct. 2404 (2010); Radich v. Goode, 886 F.2d 1391, 1393-95 (3d Cir. 1989). Although the matter is within the court's discretion once a proper affidavit is filed, "a district court should grant a rule 56[(d)] motion almost as a matter of course unless the information is otherwise available to the non-movant." Contractors Assoc. of E. Pa. v. City of Philadelphia, 945 F.2d 1260, 1267 (3d Cir. 1991). Indeed, according to the Third Circuit, "[i]f discovery is incomplete in any way material to a pending summary judgment motion, a district court is justified in not granting [summary judgment]." Doe v. Abington Friends Sch., 480 F.3d 252, 257 (3d Cir. 2007); see also Dowling v. City of Philadelphia, 885 F.2d 136, 139 (3d Cir. 1988) (court must give party opposing summary judgment adequate time for discovery); O'Connor v. Trans Union Corp., No. CIV.A.97-4633, 1998 WL 966066, at *3 (E.D. Pa. Sep. 29, 1998) (where opposing party filed an affidavit identifying information yet to be discovered, showing that information will affect summary judgment, and showing why information had yet to be obtained, court should grant Rule 56(d) motion); Lauria v. Nat'l R.R. Passenger Corp., No. CIV.A.95-1561, 1996 WL 167736, at

carries forward without substantial change the provisions of former subdivision (f). A party who seeks relief under subdivision (d) may seek an order deferring the time to respond to the summary-judgment motion." FED R. CIV. P. 56(d) (advisory committee's note to 2010 amendments).

*3 (E.D. Pa. Apr. 10, 1996) (same).   In either event, the district court must address the Rule 56(d)

motion prior to deciding whether summary judgment is appropriate.  St. Surin, 21 F.3d at 1315.

In the present case, Defendant Cola moves for summary judgment on three grounds.  First, he

contends that his Employment Agreement is not enforceable because it was signed under

unconscionable circumstances and not supported by adequate consideration.  Second, he claims that

Plaintiffs' breach of his Employment Agreement with them obviates any ability on their part to

enforce it.  Finally, he asserts that his restrictive covenant is not enforceable because he was

constructively terminated from his employment at Brown-PA.

Plaintiffs, while offering a substantive response to Defendant Cola's Motion for Summary

Judgment, have also moved for a Rule 56(d) dismissal of the Motion.  In support, they have

submitted the affidavit of Thomas Dymek, counsel for Plaintiffs.  In this affidavit, Mr. Dymek avers

that the primary arguments in Cola's Motion pertain to the enforceability of his restrictive covenants

– an issue premised on information Plaintiffs have not yet had an opportunity to discover.  (Pls.'

Resp. Def. Cola's Mot. Summ. J., Ex. F, Aff. of Thomas Dymek, ¶ 6, Feb. 7, 2011 ("Dymek Aff. for

Cola Mot.").)  For example, Cola contends that his covenants are not enforceable due to allegedly

"unconscionable" circumstances, including pressure by Frank Doyle and Kevin Mullin to sign the

agreement without consulting his attorney, Joseph Ronan.  (Id. ¶ 6 (citing Def. Cola's Mem. Supp.

Mot. Summ. J. 15-19).)  Plaintiffs, however, have not yet had the opportunity to depose Doyle,

Mullin, or Ronan to determine whether Cola's allegations are credible.  (Id. ¶¶ 7-8.)  Indeed,

Plaintiffs expect such depositions to reveal that Cola signed the Employment Agreement freely and

without duress.  (Id. ¶ 9.)  In addition, Cola asserts that he was constructively terminated from

Brown-PA due, in part, to the conduct of Thomas Riley, who acted unprofessionally in front of

unidentified employees and other professionals, as well as several clients and prospective clients.

(Id. ¶ 10 (citing Def. Cola's Mem. Supp. Mot. Summ. J. 25-26)).) To respond to such assertions, Plaintiffs need to learn the identity of these various employees, professionals, clients, and prospects, and then depose them regarding whether Riley's behavior was inappropriate and whether it had any effect on the business of Brown-PA. (Id. ¶¶ 11-12.)

The same holds true for Defendant Tola's Motion. Tola argues, in part, that the non-compete provision of his Employment Agreement is not enforceable because Defendants do not have a legitimate interest in its enforcement and because it is not supported by consideration. In response, Plaintiffs again produce a Rule 56(d) Affidavit by Thomas Dymek. (Pls.' Resp. Tola Mot. Summ. J., Ex. N, Aff. of Thomas Dymek, Jan. 11, 2011 ("Dymek Aff. for Tola Mot.").) He explains that the factual allegations in Tola's Memorandum of Law are, almost without exception, supported by the affidavits of Tola, Cola, and a business administrator of the Carteret School District, Nilkanth Patel. (Id. ¶ 5.) Nonetheless, Plaintiffs did not have the opportunity to depose any of these individuals prior to filing their Response. (Id. ¶¶ 6-8.) Moreover, Plaintiffs plan to depose a number of other individuals including designees for the Parsippany-Troy Hills School District, Sayreville Board of Education, South River Board of Education, New Courtland Elder Services, Northwestern Human Services, and Main Line Rehabilitative Services – all of whom were formerly clients of Plaintiffs and whom Plaintiffs believe have information responsive to Tola's Summary Judgment Motion. (Id. ¶¶ 9-10.) Mr. Dymek goes on to explain that because the absence of discovery at this stage of the litigation is so pervasive, Plaintiffs seek information regarding nearly every factual assertion in Defendant Tola's entire Motion, including:

- Information regarding the circumstances under which Tola began employment with Plaintiff, Grinspec, and the consideration he received;

- Information regarding the knowledge, skills and experience that Tola received, and client relationships that he developed while employed by Plaintiffs;

29

- Information regarding the legitimate interests of Plaintiffs which Tola's restrictive covenants are designed to protect, including confidential information obtained by Tola during the course of his employment with Plaintiffs and the client relationships developed by Tola during the course of his employment with Plaintiffs;

- Information regarding whether the enforcement of Tola's restrictive covenants would cause him to suffer undue hardship;

- Information regarding any potential effect on the public or Plaintiffs' former public organization clients as a result of the enforcement of Tola's restrictive covenants;

- Information regarding Tola's solicitation of Plaintiffs' clients and his efforts to conceal his solicitation;

- Information regarding Tola and Cola's solicitation of each other and other employees of Plaintiffs to work for Doyle Alliance Group;

- Information regarding the circumstances under which Tola signed an employment agreement with Brown-PA in late January 2004; and

- Information regarding Thomas Riley's alleged promises to Tola regarding certain "terms and conditions" set forth in a February 23, 2007 e-mail.[11]

(Dymek Aff. ¶ 25.)

Finally, Mr. Dymek's affidavit indicates why this needed discovery has yet to be obtained by either Defendant. The present lawsuit was filed on August 4, 2010. Motions to Dismiss were filed shortly thereafter and, ultimately, were denied on October 3, 2010. Approximately three weeks later, the Defendants filed Answers and the parties commenced a period of expedited discovery. On the first day of that discovery period, October 5, 2010, Plaintiffs served Interrogatories and Requests for the Production of Documents on all three Defendants. (Dymek Aff. for Cola Mot.¶ 15; Dymek Aff. for Tola Mot. ¶ 14.) Due to some deficiencies in Defendants' responses, the parties had to litigate a

---

[11] Mr. Dymek also avers that Plaintiffs expect to uncover facts regarding the use of the mark "Doyle Consulting Group" and Plaintiffs' non-abandonment of that mark. As discussed above, however, the Court finds that, even on the record presently available, there remains a genuine issue of material fact. Moreover, any information regarding Plaintiffs' use of that mark remains exclusively within their own hands, meaning that further discovery will likely yield no additional, pertinent information.

motion to compel, which was decided by the Court, on January 5, 2011, in partial favor of Plaintiffs. (Dymek Aff. for Cola Mot. ¶¶ 16-18; Dymek Aff. fo Tola Mot. ¶¶ 15-17.)  According to Mr. Dymek, Defendants have not, to date, provided full and complete production of all of their personal e-mails as requested.  (Dymek Aff. for Cola ¶¶ 19-21.)  Further, Tola has not provided any responses or objections to a slew of discovery requests, and has yet to produce his initial disclosures.  (Dymek Aff. for Tola ¶¶ 22-23.)   To add to the delay, on January 19, 2011, the parties consented to an effective "stand-still" agreement while they pursued private mediation.  (Dymek Aff. for Cola ¶ 13.) On March 8, 2011, that private mediation concluded unsuccessfully, leaving the parties with additional discovery to pursue.

Taking all of these specific and thoroughly-detailed allegations in light of the Rule 56(d) standards, the Court finds that consideration of the remainder of Defendants' summary judgment motions is, at this juncture, premature.  First, a substantial portion of Defendants' Motions are based on affidavits from individuals who, at the time of Plaintiffs' Responses, had yet to be deposed, leaving their credibility unfairly free from challenge.  Second, the various causes of action at issue are highly fact-sensitive, meaning that the information sought by further discovery could drastically affect the outcome of summary judgment review.  Finally, this Court recognizes that although Plaintiffs have diligently pursued discovery since October 2010, they have been met with some resistance by Defendants and have been limited by a stipulated "stay" on the case pending mediation since mid-January 2011.  As Plaintiffs' arguments are "genuine and convincing" on all fronts, "a continuance of the motion for purposes of discovery should be granted almost as a matter of course." Mid-South Grizzlies v. Nat'l Football League, 720 F.2d 772, 779 (3d Cir. 1983).  Accordingly, the Court deems additional discovery under Rule 56(d) warranted and denies the remaining portions of Defendants' Motions for Summary Judgment without prejudice to re-submission after discovery has

been completed.

## IV.    CONCLUSION

In light of the foregoing, the Court denies the Motions for Summary Judgment of both Defendants Cola and Tola, in part with prejudice and in part without prejudice. To the extent Defendants seek summary judgment on the Lanham Act claims based on abandonment grounds and, in turn, dismissal of the entire case for lack of subject-matter jurisdiction, the Court finds that genuine issues of material fact preclude such a ruling. To the extent Defendants seek a definitive ruling on the enforceability of their Employment Agreements with Plaintiffs, the Court concludes that these issues are prematurely raised and are better suited to resolution following the close of discovery.