IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BROWN & BROWN, INC., et al., | : | |
| BROWN & BROWN OF | : | |
| PENNSYLVANIA, INC. and GRINSPEC, | : | |
| INC. | : | |
| | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| ROBERT COLA, RYAN TOLA, and | : | NO. 10-3898 |
| DOYLE ALLIANCE GROUP, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

BUCKWALTER, S. J.                                                                                                             June 15, 2011

**FINDINGS OF FACT**

1. Plaintiff Brown & Brown, Inc. ("Brown & Brown") is a national insurance brokerage and service company. (Compl. ¶ 13.)

2. Plaintiffs Brown & Brown of Pennsylvania, Inc. ("Brown-Pa.") and Grinspec, Inc. ("Grinspec") are wholly-owned subsidiaries of Brown & Brown. (N.T. 3/29/2011, Robert Cola, at 12:5-8; 20:4-7.)

3. Brown & Brown and its subsidiaries, including Brown-Pa. and Grinspec, offer a broad range of insurance and reinsurance products and services, as well as risk management, third-party administration, insurance consulting, and other insurance-related services to both the public and private sectors. (Compl. ¶ 13.)

4. Brown & Brown has a number of subsidiary companies throughout the country, with each focused on the insurance needs of its clients in a particular region or for particular

insurance products. Brown-Pa. and Grinspec are two of Brown & Brown's subsidiaries, based in Pennsylvania and New Jersey, respectively. (Id. ¶¶ 14-15.)

5. One particular brokerage business in which Brown & Brown had an acquisition interest – Doyle Consulting Group, Inc. and Doyle Consulting Group of New Jersey, Inc. (collectively, "Doyle Consulting Group") – was owned by Frank Doyle and Kevin Mullin. (N.T. 3/29/2011, Robert Cola, at 7:17-8:1.)

6. Discussions between Brown & Brown, on the one hand, and Doyle Consulting Group, Doyle and Mullin, on the other hand, culminated in February 2004 with the execution of an Asset Purchase Agreement through which Brown & Brown and the newly created Brown-Pa. acquired the assets of Doyle Consulting Group.(N.T. 3/29/2011, Robert Cola, at 12:5-8.

7. The closing on the Asset Purchase Agreement occurred on February 1, 2004. (See Asset Purchase Agreement, attached as Exh. C to Pls.' Resp. to Cola's Mot. for Summ. J.)

8. Following the closing and as part of the transaction, Doyle joined Brown-PA as its Executive Vice President, and all of the customers and accounts of Doyle Consulting Group became customers and accounts of Brown & Brown and its subsidiaries, including brown Pa.(N.T. 3/29/2011, Robert Cola, at 13:15-25; 15:21-24.)
2004.

9. Prior to February 2004, Defendant Robert Cola was an employee and key broker for Doyle Consulting Group. (N.T. 3/29/2011, Robert Cola, at 20:11-13.)

10. Cola developed relationships with the clients of Doyle Consulting Group, clients which he would continue to service after the business was purchased by Brown & Brown. (N.T. 3/29/2011, Robert Cola, at 110:9-16.)

11. Prior to February 2004, Defendant Ryan Tola also was an employee and key broker for Doyle Consulting Group. (N.T. 3/29/2011, Robert Cola, at 20:11-13; N.T. 3/29/2011, Ryan Tola, at 136:21-137:1.)

12. Section 7.17(a) of the Asset Purchase Agreement required Doyle Consulting Group to terminate the employment of certain of its employees, including Cola and Tola, prior to January 30, 2004. (See Asset Purchase Agreement, attached as Exh. C to Pls.' Resp. to Cola's Mot. for Summ. J.)

13. Accordingly, upon the acquisition of the assets of Doyle Consulting Group by Brown & Brown and Brown-Pa., Cola and Tola's respective employment with Doyle Consulting Group ended. (Id.)

14. Pursuant to the Asset Purchase Agreement, Doyle Consulting Group terminated Tola's and Cola's employment effective February 1, 2004. (Id.)

15. In turn, the newly-formed Brown-Pa. agreed to offer new employment to those same employees, including Cola and Tola, following their termination by Doyle Consulting Group. (Id.)

16. Cola and Tola each accepted Brown-Pa.'s offer, signing Employment Agreements that became effective on February 1, 2004 and contained the restrictive covenants at issue here. (Pls.' Exhs. 43, 68.)

17. To become an employee of Brown-Pa., Cola was required to sign an employment agreement containing certain restrictive covenants. (Pls.' Exh. 68.)

18. Cola was presented with the Brown-Pa. employment agreement on Friday, January 23, 2004. (Cola Aff. at ¶ 8, attached as Exh. A to Cola's Mot. for Summ. J.)

19. Cola then had three days to review that agreement and consult with an attorney of his choice before he signed it. (Id. at ¶ 9.)

20. During that time, Cola did, in fact, telephone an attorney, although he apparently was unable to reach him.(Id. at ¶ 12.)

21. Cola signed his Employment Agreement on January 26, 2004.(Pls.' Exh. 68; N.T. 3/29/2011, Robert Cola, at 12:24-13:1.)

22. Cola's Employment Agreement with Brown-Pa. was also signed by Frank Doyle. (Pls.' Exh. 68; N.T. 3/29/2011, Robert Cola, at 13:2-7.)

23. Section 8(e) contains, inter alia, the following statement:

> Employee has carefully considered, and agrees that the provisions of this Section are fair, reasonable, and not unduly restrictive on Employee, and that Employee has had an opportunity to obtain legal advice before agreeing to its terms.

Id. § 8(e).

24. In his Employment Agreement, Cola agreed to a series of restrictive covenants designed to protect the business interests and goodwill that Plaintiffs purchased, as well as the further goodwill earned by Plaintiffs through their own hard work. (Pls.' Exh. 68.)

25. There are a series of confidentiality provisions (paragraph 8 (a) and 10 of the agreement) as well as a non-solicitation provision (paragraph 8(b) of the agreement, in the Cola agreement.

26. In connection with and following Brown & Brown's acquisition of Doyle Consulting Group, Tola's employment with Doyle Consulting Group ended, and he, like Cola, became an employee of Brown-Pa., executing an employment agreement with Brown-Pa. dated February 1, 2004. (Pls.' Exh. 40.)

27. Between March of 2000 and February of 2004, Tola worked for DCG as an employee benefits junior consultant. (N.T., 3/29/11, 136:21-23.)

28. At DCG, Tola learned the skills of an insurance broker and consultant, especially in the area of employee benefits. Tola learned about all aspects of analyzing employee benefit programs, marketing DCG's services and servicing accounts in connection with employee benefit programs. Tola also established relationships with accounts, most of whom were New Jersey school districts. (N.T., 3/29/11, 173:9-174:24.)

29. In early 2004, Tola learned that DCG was being sold to the Brown & Brown organization. (N.T., 3/29/11, 137:25-138:5.)

30. At the time of the acquisition, Tola considered himself to be an expert in the area of employee benefits insurance. (N.T., 3/29/11, 174:21-23.)

31. At that time, Tola was in charge of the public sector division of DCG.

32. Years later, in April 2007, Tola was promoted and began employment as the Profit Center Leader of Grinspec, a new Brown & Brown subsidiary. (N.T. 3/29/2011, Robert Cola, at 20:14-17; N.T. 3/29/2011, Ryan Tola, at 141:15-142:3.)

33. In connection with his new position and employment, Tola signed a new employment agreement – this time with Grinspec, effective as of April 2, 2007. (Pls.' Exh. 43.)

34. Tola's employment agreement with Grinspec contains similar, although not identical, provisions as in Cola's agreement. For Tola's provisions, see p. 43 8(a) 10 and 8(b) and 9.

35. When Cola and Tola began working for Brown & Brown, after being with the Doyle Consulting Group (DCG), many of DCG's clients such as Northwestern Human Services, Inc. ("NHS"), Elwyn, Inc. and New Courtland became clients of Brown-PA. (N.T., 3/29/11, 13:15-25; 15:21-24.) These clients all had long standing relationships with Doyle and were Doyle's clients prior to the asset acquisition. (N.T., 3/30/11, 70:14-21; see also 100:1-23; 106:23-107:18.)

36. Following the acquisition, the Brown & Brown organization's management did not attempt to change the manner by which DCG had previously conducted business. (N.T., 3/29/11, 175:23-176:20.)

37. Following the acquisition, the Brown & Brown organization did not change any of DCG's marketing materials or change the way that DCG went about marketing its services. (N.T., 3/29/11, 176:21-177:1.)

38. Following the acquisition, the DCG employees conducted their business in the same way that they had prior to the acquisition. (N.T., 3/29/11, 174:25-175:4.)

39. In February 2006, Cola ascended to the highest executive position at Brown-Pa. following the resignation of Doyle from the position. Cola was the "Profit Center Leader," a term used by Brown & Brown companies to signify the leader of each business unit.

(N.T. 3/29/2011, Robert Cola, at 15:3-8.) Similarly, Tola, who began with Brown-Pa. in February 2004, became Profit Center Leader of Grinspec in April 2007. (N.T. 3/29/2011, Ryan Tola, at 141:18-25.)

40. In 2006, Doyle stepped down as Profit Center Leader but he remained employed by Brown-PA until October 2007. (N.T., 3/29/11, 14:5-15:6.) Thereafter, Cola took Doyle's place as Profit Center Leader of Brown-PA in 2007. (N.T., 3/29/11, 15:3-20.)

41. After resigning from Brown-PA in 2007, Doyle remained connected with his former clients through, <u>inter alia</u>, his work on various boards and foundations. For example, Doyle was a longtime member of both the Elwyn, Inc. and the NHS Foundation boards. (N.T., 3/29/11, 71:21-72:6; <u>see also</u> N.T., 3/30/11, 29:24-31:4.)

42. Any restrictions on Doyle's ability to compete in the marketplace, including his ability to solicit Plaintiffs' employees or clients, expired at the latest in October 2009. (<u>See</u> Exhibit C to Cola Summary Judgment Motion, Asset Purchase Agreement, ("APA") at Section 7.5 & Doyle's Employment Agreement with Brown-PA at p. 4; <u>see also</u> N.T., 3/30/11, 73:8-20.)

43. Plaintiffs admit that there is no evidence demonstrating that Doyle violated any alleged restrictions imposed on him by the APA or his employment agreement and Plaintiffs admitted that Doyle was free to utilize his skills and know how when soliciting Plaintiffs' former customers:

> Q: You were aware in 2010 that Frank Doyle was under no restriction, correct?
> A: Correct.
> Q: That he was free to compete for each and every one of these customers that's on this list, correct?
> A: Correct.

-7-

> Q: And you're aware that he's still free to compete for each and every one of these customers, correct?
> A: As the agreement reads, yes.
> Q: And you're aware that whatever was in his brain, Frank Doyle's brain, he was under no covenant restricting his use of that either, was he?
> A: No.

(N.T., 3/30/11, 73:8-20.)

44. In 2009 and early 2010, Cola, Tola, and Doyle planned the formation of a new company that would compete with Brown & Brown in acquiring the business of a number of Brown & Brown's then-current customers.

45. To this end, Cola, Tola, and Doyle created a new company, Doyle Alliance Group, to compete directly against Plaintiffs.

46. Cola, Tola, and Doyle's first began the planning and formation of Doyle Alliance Group as early as December 2009, nearly seven months before Cola and Tola actually resigned from their positions as the top-ranking officers of Brown-Pa. and Grinspec, respectively. (N.T. 3/29/2011, Ryan Tola, at 144:20-145:24.)

47. Cola and Tola each have admitted that, while still employed by Brown & Brown, they planned and formed Doyle Alliance Group in violation of their respective Employment Agreements. (N.T. 3/29/2011, Robert Cola, at 32:18-33:10; N.T. 3/29/2011, Ryan Tola, at 151:6-15.)

48. When asked, "[Y]ou planned and organized a business activity competitive against Brown & Brown, right?" Cola responded, "Yes." (N.T. 3/29/2011, Robert Cola, at 32:18-33:10.)

49. Similarly, when asked, "You and I can agree that you . . . were involved in aspects of planning and organizing a competitive business activity, namely Doyle Alliance Group?" Tola responded, "Yes." (N.T. 3/29/2011, Ryan Tola, at 151:12-15.)

50. Months prior to their resignations, and while they were being paid by Plaintiffs, Cola and Tola were actively engaged in building that competitive business – deciding on office space, technology and other components for the new business. (Pls.' Exhs. 4-5; N.T. 3/29/2011, Robert Cola, at 26:24-31:16; N.T. 3/29/2011, Ryan Tola, at 147:18-150:11.) During the first six months of 2010, Cola and Tola had meetings, communications and conversations with Doyle and others affiliated with Doyle Alliance Group during which they discussed their intention to combine efforts and take Plaintiffs' customers and employees to the new Doyle Alliance Group. (N.T. 3/29/2011, Ryan Tola, at 146:10-19.)

51. Cola understood that Doyle was free of his contractual obligations not to compete with Brown-PA or to solicit Brown-PA customers or employees. (N.T., 3/29/11, 70:6-12; see also N.T., 3/30/11, 73:8-16.)

52. Because of Doyle's numerous business connections and the relationships Doyle maintained with his former clients, Cola understood the significant threat to Brown-PA's business that Doyle's return presented. (N.T., 3/29/11, 70:1-73:22; 81:23-83:4.)

53. It was, in fact, Doyle who originally established the relationships with customers such as NHS, New Courtland, and Elwyn, as they had each been customers of DCG before becoming customers of Brown-PA. (N.T., 3/29/11, 110:17– 11:14; N.T., 3/30/11, 70:14-21; 72:2-7.)

54. Cola and others in the Brown-PA office believed that these customers would leave Brown-PA for Doyle as soon as DAG started up, and Cola would be powerless to stop them from leaving Brown-PA for Doyle. (N.T., 3/29/11, 81:23-82:11.

55. Cola did not believe that his relationship with these customers could overcome Doyle's relationship with them—to these clients, Cola was "the guy who worked for Frank." (N.T., 3/29/11, 81:25-83:4; 85:1-13.)

56. When Cola learned of Doyle's intention to compete with Brown-PA, Cola immediately warned Riley, Regional President of Brown-PA, of the serious impact Doyle could have on Brown-PA's business. (N.T., 3/29/11, 71:4-73:22.)

57. Riley, however, never took any action, despite repeated warnings by Cola that Doyle would lure away Brown-PA's customers. (N.T., 3/29/11, 72:10-73:22.)

58. Cola believed he had no option but to consider joining DAG, as he had a family to provide for and, despite years of trying, he had not been able to obtain other employment due to the restrictive covenant in his Brown-PA Employment Agreement. (N.T., 3/29/11, 86:4-14.)

59. In furtherance of their plan to establish Doyle Alliance Group as a competitor to Plaintiffs, and while still employed by Plaintiffs, Cola and Tola copied or took with them confidential and proprietary information of Brown & Brown, Brown-Pa. and Grinspec to use those materials in their new employment with Doyle Alliance Group.

60. In March 2010, Doyle formed DAG to provide employee health and welfare benefits brokerage services in New Jersey and Pennsylvania. Doyle is DAG's lone shareholder.

61. Prior to forming DAG, Doyle worked in employee health and welfare benefits brokerage industry for over twenty years and he gained significant background knowledge and experience regarding the industry and industry practice. In that time, Doyle also made a myriad of business contacts, serviced a number of clients (including the clients at issue in this litigation) and gained vast amounts of experience running a successful employee health and welfare benefits brokerage firm. (See e.g., N.T., 3/30/11, 70:14-73:20).

62. When Doyle established DAG in March 2010, he was completely privileged to compete in the marketplace and there were no restrictions on his ability to solicit, service, hire and/or contact any of Plaintiffs' customers or employees. (Id.).

63. To form DAG, Doyle re-integrated himself into the relevant business marketplace and contacted many of his former clients, business contacts and friends to alert them that he was in the process of establishing a company that would compete with Brown-PA. (See e.g., Affidavit of Andrew Seibert ("Seibert Aff.") at ¶¶ 12, 14-17 & Affidavit of M. Joseph Rocks ("Rocks Aff.") at ¶¶ 12–16).

64. Doyle had maintained close contacts with customers Brown-PA had acquired through its acquisition of DCG in 2004, including the Elwyn Inc. and NHS. (N.T., 3/30/11, 71:21-72:9.)

65. In April 2010, at the request of one of Doyle's former clients, Elwyn, Inc.'s president, Dr. Sandra Cornelius, Doyle sponsored a charity event for Fragile X Syndrome at the Union League. (N.T., 3/30/11, 46:15-24).

66. Doyle also met with a number of other individuals including his long time contacts, Senator M. Joseph Rocks, the Chairman and CEO of NHS Human Services, and Drew Seibert, the CFO of New Courtland Elder Services. (Rocks Aff. at ¶¶ 12-16; Seibert Aff. at ¶¶ 12, 14-17).

67. NHS, along with two of its subsidiaries, Allegheny Valley School and The Association for Independent Growth ("TAIG"), are one of the largest not-for-profit human services providers in the United States employing approximately 11,000 individuals in various capacities. (Rocks Aff. at ¶¶ 2, 7-8).

68. Like NHS, New Courtland is a diverse, human services organization with approximately 2,200 employees serving individuals at 37 locations throughout the City of Philadelphia. (Seibert Aff. at ¶¶ 2, 7-8).

69. NHS, AVS, TAIG, New Courtland and Elwyn were all potential clients of DAG who, based upon their relationship with Doyle, issued broker of record letters in favor of DAG after its formation.

70. Cola has avoided soliciting Brown & Brown's former customers. (N.T., 3/29/11, 90:20-91:9.) There is one instance as pointed out by Plaintiff, "when Cola provided ideas for an Elwyn proposal." (N.T., 3/29/11, 50).

71. With the exception of one time when, after his resignation from Brown-PA, NHS asked Cola to assist them with a mandatory mailing to its employees because Brown-PA had refused, Cola has avoided servicing Brown & Brown's former customers who have chosen to become customers of DAG. (N.T., 3/29/11, 54:9-12; 86:15-89:19; 90:20-91:9.)

72. Tola has not used any of the information the Brown & Brown organization attempts to define in Paragraph 8(a) of the Grinspec Agreement as confidential in his employment with DAG. (N.T., 208:17-23.)

73. Tola sent e-mails to some of the accounts he serviced while he was employed by Grinspec advising them of his change in employment, but he did not solicit their business. (N.T., 3/29/11, 156:3-159:11; 162:23-163:3.)

74. The employee health and welfare benefits industry is a highly regulated industry that is a constantly changing and evolving. (Affidavit of Thomas Pappas ("Pappas Aff.") at ¶¶ 13-18).

75. Information relating to clients and potential clients such as census data, claims history renewal dates, premiums, types of plans and rate history is constantly fluctuating and changing. (Pappas Aff. at ¶¶ 13-18; see also, N.T., 3/30/11, 31:5-35:19.)

76. These changes may be brought about by the changing size of an employer's work force, by legislation such as the Health Care Reform Act, by changes in the industry and/or changes in the marketplace. (Pappas Aff. at ¶¶ 13-18; see also, N.T., 3/30/11, 31:5-35:19.)

77. Because of this, information such as employee census data, claims history renewal dates, premiums, types of plans and rate history that may have been relevant at some point becomes obsolete very quickly. (Pappas Aff. at ¶¶ 13-18; see also, N.T., 3/30/11, 31:535:19.)

78. Further, information relating to Plaintiffs' and DAG's customers and clients is available in the public domain from a number of sources. (Pappas Aff. at ¶¶ 13-18; see also, N.T., 3/30/11, 31:5-35:19; 94:1-97:19.)

79. For example, there are numerous websites like FreeErisa.com and other statutes such as the Freedom of Information Act that permit entities like DAG access to information relating to clients and potential clients' businesses. (N.T., 3/29/11, 94:1-97:19; 164:11-165:13.)

80. Likewise, brokers competing in the public sector market in New Jersey also can obtain customer lists and customer contact information through various trade organizations. (N.T., 3/29/11, 167:23-168:9.)

81. Currently, DAG employs twelve individuals in its Philadelphia, PA and Woodbridge, NJ offices. (N.T., 3/29/11, 92: 4-13).

82. One of these employees is Jana Jim who is a former Brown-PA employee and long term contact of Cola. (N.T., 3/29/11, 92: 4-8 & N.T., 3/30/11, 99: 15-22; 111:11-112:11.)

83. As a DAG employee, Jim is not servicing any of Plaintiff's former clients. (N.T., 3/29/11, 92: 4-8; N.T., 3/30/11, 99:15-22, 111:11-112:11.)

84. Jim is an employee with many years of experience in the employee health and welfare benefits industry. (N.T., 3/29/11, 92: 4-8; N.T., 3/30/11, 99:15-22; 111:11-112:11.)

85. Doyle offered Jim a position with DAG only after learning she was unhappy working at Brown-PA. (N.T., 3/30/11, 112: 15-113:13; 113:14-115:13.)

86. Cola similarly solicited another Brown-PA employee, Al Danish, for employment with Doyle Alliance Group. (N.T. 3/29/11, Cola, at 56:2-3).

87. As in the case of Jana Jim, Danish, when told Cola was leaving, expressed an interest immediately in going with him, although he subsequently did not. (N.T. 3/29/11, Cola at 57:8-25, 58:1).

## CONCLUSIONS OF LAW

There is no question that while Cola and Tola were working for Plaintiffs, they both were involved in the start up of a competitor.

However, the evidence is not at all clear that after Cola and Tola left Plaintiff's employment that they violated the covenants of their respective agreements with Plaintiffs.

Because both parties are aware of the applicable law regarding preliminary injunctions, I will not rehash it in this opinion.

It suffices to say that while there may be a likelihood of success as to some of Plaintiffs' complaint (clearly Cola and Tola violating portions of their respective agreements while they were still employees of Plaintiffs), there is a substantial likelihood that Plaintiffs will not prevail in any of the allegations of conduct on the part of Cola and Tola since they left the employment of Plaintiffs. The testimony I heard and the facts I

have found (specifically Findings of Fact 70, 71, 72, 73 and 83) from the hearing on the preliminary injunction supports this conclusion.

This is not to suggest that Plaintiffs' arguments when presumptively augmented by other testimony at a trial of this case will not succeed. But I have only the record of the hearing and exhibits before me and on that, Plaintiffs have failed to persuade me that it has a likelihood of success.

The immediate irreparable harm element for injunctive relief is missing as well. The evidence from the hearing supports a conclusion that any harm Plaintiffs have suffered from Defendants' breach of contract can be adequately remedied by money damages. There simply is not a clear showing of immediate irreparable harm based on my findings that neither Cola or Tola are violating the agreement as of the date of the hearing.

From the hearing, I determined that both Cola and Tola are aware of the terms of their agreement with Plaintiffs and are acting in a manner consistent with its prohibitions; i.e., they are not using confidential information of soliciting or servicing customers of Plaintiffs. Thus, as Defendants have suggested in their brief, no great harm will result to Plaintiffs if the injunction is not granted. By contrast, the same cannot be said of Defendants Cola and Tola if the court were to enter the requested injunctive relief.

Based upon the foregoing, the order to be entered here is obvious based as it is on the limited evidence presented at a short day and a half of testimony. Defendants should

keep in mind (to paraphrase an old adage) that while they have won this battle, they have not won the war.

An order follows.